BeyaN, District Judge,
sitting by designation, delivered the opinion of the court:
Ambiguities in the contract, it is alleged, caused additional costs in the manufacture of several thousand camp tables for the United States Army, and for these outlays the contractor now petitions us to award judgment against the United States. Having satisfied the contract price, the Government replies that the incurrence of the added expense was wholly voluntary and without promise or obligation, express or implied, of reimbursement. We agree with the defendant.
Condensed, the facts are these. A preproduction, finished specimen table was, pursuant to the contract, submitted to the Government’s contracting officer and, in the respects relevant here, approved by him. After about 600 of the tables similar to the sample had been processed, they were exhibited to the Army Quartermaster’s inspector. He found they failed in two particulars to meet the specifications. First, he said, “the four vertical edges of each leg” had not been “sanded smooth”. Second, he noted in the language of the specifications again, that although “All surfaces of the table” had been “given a coat of sealer” and “after drying, a coat of olive drab enamel” had been “applied to all surfaces”, yet because the table tops were still not attractive, “the finished articles” were not “free from any defect which may affect appearance”.
One imprecision in the specifications is that “vertical edges” could mean either the flat faces of the square, tapering legs of the table or the line of intersection of the planes of the faces. Plaintiff had assumed the latter; the inspector held the other view. The other uncertainty arose because the table tops were of cottonwood, and this wood, while acceptable under the contract, is soft as well as varying in its parts in absorbency, with the result that a sealer or paint will raise the fiber and grain of the wood. The effect is to mar the appearance without lessening the durability of the table.
Entirely amenable, the contractor dismantled the tables and reprocessed them, as well as the materials awaiting assembly, in conformity with the inspector’s judgment. This pattern was followed for several weeks until this inspector *103 was replaced by another. But the successor inspector decided, on inquiry from the plaintiff, that the original method of finishing the tables was proper. Whereupon the contractor reverted to that process and in that form completed the contract. The additional costs now sought are the expense occasioned by the adoption of the first inspector’s interpretation.
For our decision, we may accept the plaintiff’s assertion of ambiguity in both of the pertinent specifications. We may likewise grant that the new work was actually not within the contract and, also arguendo, that the first inspector’s directions caused the excess investment now claimed by the plaintiff. But still the loss would be unrecoverable. The reason is that in these disbursements the plaintiff was a volunteer.
Quite explicitly the contract vested the contracting officer, subject only to appeal, with the power to resolve “any dispute concerning a question of fact arising under this contract”. Further, at the inception of the agreement the contractor was advised in writing by the Government, inter alia,: “The Inspector has no authority to advise or direct a contractor to use a particular method of production. * * * If a contractor * * * accepts advice from an inspector, the contractor assumes sole responsibility for the results thereof.”
As the plaintiff must admit, the additional costs were ultra oontractum,. Therefore, to win their recovery some extrinsic promise, implied or express, must be shown, such as an involuntary and compelled compliance, an allowed extra or a change in the contract. But an expenditure could not be involuntary and compelled without a previous protest to the contracting officer; J. A. Ross & Company v. United States, 126 C. Cl. 323, 329 (1953); and under the contract he alone could bind the defendant to an extra or a change. Thus, the plaintiff having acceded without objection to the inspector’s demands, and now unable to plead either an ordered extra or an authorized change, the plaintiff’s claim is without legal predicate.
We have thus far considered the questions presented by the plaintiff’s claim as matters of law. But if they be *104 factual, the administrative action has adequately and conclusively answered them. Dejected by the contracting officer, on review the Armed Services Board of Contract Appeals likewise adjudged the claim unfounded.
Denial and dismissal of the petition are ordered.
Laramore, Judge./ Madden, Judge; Whitaker, Judge, and Jones, Chief Judge, concur,
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Mastín G. White, and the briefs and arguments of counsel, makes findings of fact as follows:
1. The plaintiff is, and at all times material to this action was, a corporation duly created, organized, and existing under the laws of the State of Michigan, with its principal office and place of business at Bay City, Michigan.
2. On September 25, 1951, the plaintiff and the defendant (acting through a contracting officer of the Chicago Quartermaster Depot, United States Army Quartermaster Purchasing Division) entered into a written contract, No. DA 11-009-QM-13021 (hereafter referred to in the findings as “the contract”), whereby the plaintiff agreed to construct and deliver to the defendant 15,398 folding camp tables. The tables were to be made of wood and in accordance with Military Specification MIL-T-3338, “Table, Camp, Folding,” dated November 7, 1950 (hereafter referred to in the findings as “the specifications”), at a unit price of $6.508 per table, or a total contract price of $100,210.18.
3. The contract contained the following general provisions (among others):
2. CHANGES
The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes, within the general, scope of this contract, in any one or more of the following: (i) drawings, designs, or specifications, where the supplies to be furnished are to he specially manufactured for the Government in accordance therewith; (ii) method of shipment or packing; and (iii) place of delivery. If any such change causes an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjust *105 ment shall be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly. Any claim by the Contractor for adjustment under this clause must be asserted within SO days from the date of receipt by the Contractor of the notification of change: Provided, however, That the Contracting Officer, if he decides that the facts justify such action, may receive and act upon any such claim asserted at any time prior to final payment under this contract. Failure to agree to any adjustment shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled “Disputes.” However, nothing in this clause shall excuse the Contractor from proceeding with the contract as changed.
3. EXTRAS
Except as otherwise provided in this contract, no payment for extras shall be made unless such extras and the price therefor have been authorized in writing by the Contracting Officer.
‡ ¡H $ $ &
5. INSPECTION
(a) All supplies (which term throughout this clause includes without limitation raw materials, components, intermediate assemblies, and end products) shall be subject to inspection and test by the Government, to the extent practicable at all times and places including the period of manufacture, and in any event prior to final acceptance.
(5) In case any supplies or lots of supplies are defective in material or workmanship or otherwise not in conformity with the requirements of this contract, the Government shall have the right either to reject them (with or without instructions as to their disposition) or to require their correction. Supplies or lots of supplies which have been rejected or required to be corrected shall be removed or corrected in place, as requested by the Contracting Officer, by and at the expense of the Contractor promptly after notice, and shall not again be tendered for acceptance unless the former tender and either the rejection or requirement of correction is disclosed. If the Contractor fails promptly to remove such supplies or lots of supplies, when requested by the Contracting Officer, and to proceed promptly with the replacement or correction thereof, the Government, either (i) may by contract or otherwise replace or correct such supplies and charge to the Contractor the cost occasioned the Government thereby, or (ii) may termi *106 nate this contract for default as provided in the clause of this contract entitled “Default.” - Unless the Contractor elects to correct or replace the supplies which the Government has a right to reject and is able to make such correction or replacement within the required delivery schedule, the Contracting Officer may require the delivery of such supplies at a reduction in price which is equitable under the circumstances. Failure to agree to such reduction of price shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled “Disputes.”
(d) The inspection and test by the Government of any supplies or lots thereof does not relieve the Contractor from any responsibility regarding defects or other failures to meet the contract requirements which may be discovered prior to final acceptance. Except as otherwise provided in this contract, final acceptance shall be conclusive except as regards latent defects, fraud, or such gross mistakes as amount to fraud.
H» »Sí sjí «I»
12. BISPUTES
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall be final and conclusive: Provided, That if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer’s decision.
4. (a) The specifications contained a list of woods from which the cleats and legs of the folding camp tables should be made, and another list of woods from which the tops, leg stays, and spreaders of such tables might be made. The *107 second list was composed of basswood, cottonwood, ponder-osa pine, eastern white pine, western white pine, sugar pine, and yellow poplar.
(b) The specifications contained the following additional provisions (among others) :
3.2 Construction. — The construction shall conform to the design, shape, and dimensions shown on drawing and as specified herein. All wood components shall be smoothly surfaced on four faces and ends to remove all manufacturing defects such as skips, chipped or torn grain, saw cuts, planer or other machine marks. The top surface, and edges of the table top and the four vertical edges or each leg and edges of the cleats shall be sanded smooth. * * *
❖ * • * ❖ *
3.3.2 Table. — All surfaces of wood members shall be cleaned of dust, glue, or foreign matter. All surfaces of the table shall be given a coat of sealer * * *. After drying, a coat of olive drab enamel * * * shall be applied to all surfaces.
# í«í %
3.5 Preproduction sample. — Before production is commenced, unless otherwise specified in invitation for bids, contract or order, a sample of the finished commodity shall be submitted to the contracting officer for approval. When the initial production sample is approved, it shall be retained by the contractor throughout production of the contract. This sample may be included in the quantity required for the last shipment.
3.6 Workmanship. — The finished articles shall be clean, well made, and free from any defect which may affect appearance or serviceability.
5. The plaintiff commenced the manufacture of the tables under the contract on or about October 8, 1951.
6. (a) The legs of the tables called for by the contract and the specifications were tapered. They had four vertical flat surfaces each and four vertical sharp corners where the flat surfaces came together.
(b) The portion of paragraph 3.2 of the specifications which stated that “the four vertical edges of each leg * * * shall be sanded smooth” was ambiguous, because there existed in the woodworking industry during the life of the contract, and there still exists in the industry, a difference of opinion *108 as to whether, in the case of a table leg with vertical flat surfaces and vertical sharp corners marking the confluence of the flat surfaces, the vertical flat surfaces or the vertical sharp corners should be regarded as the vertical edges of the table leg.
(c) At the time when the plaintiff entered into the contract, and until November 28, 1951, at least, the plaintiff regarded the vertical sharp corners of the table legs as the vertical edges of the legs. The plaintiff was unaware at the time of the other view held by some persons in the woodworking industry that, in the case of a table leg with vertical flat surfaces and vertical sharp corners marking the confluence of the flat surfaces, the vertical flat surfaces comprise the vertical edges of the table leg. Consequently, in its manufacturing operations between October 8 and November 28, 1951, the plaintiff, in what it believed to be compliance with the requirement in paragraph 3.2 of the specifications that “the four vertical edges of each leg * * * shall be sanded smooth,” sanded the four vertical sharp corners of each table leg for the purpose of making the corners smooth. It did not perform a sanding operation for the purpose of smoothing the vertical flat surfaces of the table legs.
7. (a) Pursuant to the authorization contained in the specifications, the plaintiff selected cottonwood as the wood from which to make the tops, leg stays, and spreaders of the tables. Cottonwood is comparatively inexpensive, and this was a factor that led to its choice by the plaintiff.
(b) Although cottonwood is technically classed as a hardwood (since the cottonwood tree is broad-leaved and deciduous) , it is relatively soft in texture and absorbent. Because of the absorbent quality of cottonwood, there is a tendency for sealer or paint to raise the fiber, and sometimes the grain, of the wood. Also, the heartwood portion of cottonwood is more absorbent than the sapwood portion, so that a single piece of cottonwood may vary in the degree of absorbency. Consequently, the application of a single coat of sealer and a single coat of paint to cottonwood does not result in a uniform, smooth, and refined finish of the sort that would be expected in fine furniture. On the other hand, the finish resulting from such an operation on cottonwood is generally *109 regarded as satisfactory for types of furniture that are expected to receive rather rough usage.
(c) In its manufacturing operations between October 8 and November 28,1951, the plaintiff, pursuant to paragraph 3.8.2 of the specifications, gave all surfaces of the wood components of the tables, including the cottonwood table tops, a coat of sealer, and then, after they were dry, applied a coat of olive drab enamel to all surfaces.
8. (a) In a telegram dated October 8, 1951, the plaintiff submitted the following request to the Chicago Quartermaster Depot:
Please have inspector contact us with regards to contract number DA 11-009-QM-13021 camp folding table to assist us in obtaining approval on packing materials and general construction.
(b) In a followup telegram dated October 19, 1951, the plaintiff stated as follows:
Imperative that you have Government inspector come to our plant so that we might proceed with forms and jigs necessary on camp folding table contract number DA-11-009-QM-13021.
9. On October 24, 1951, the area supervisor of inspection for the Metal and Wood Division of the Chicago Quartermaster Depot visited the plaintiff’s plant. He explained the details of the defendant’s inspection requirements and how inspection was performed by the defendant’s personnel. While at the plaintiff’s plant, the supervisor inquired whether the plaintiff had submitted a preproduction sample of the folding camp table in accordance with paragraph 3.5 of the specifications; and, upon receiving a negative answer, he urged that a sample be forwarded to the contracting officer as soon as possible.
10. A sample of the folding camp table being manufactured by the plaintiff was forwarded to the contracting officer by the plaintiff soon after October 24,1951.
11. Change Order No. 1 was issued by the contracting officer under the contract on November 15, 1951. It directed that 1,000 of the tables to be manufactured by the plaintiff should be packed for export shipment, and it increased the unit price for these particular tables to $6,958. The contract *110 price was thereby increased by $450 to a total of $100,660.18.
12. (a) In a letter dated November 21,1951, the contracting officer informed the plaintiff that the sample table theretofore submitted by the plaintiff generally met the requirements of the specifications as to size, color, design, and appearance, but that certain deviations (which were specified in the letter) had been noted and that these must be corrected in production.
(b) The list of deviations from the specifications set out in the contracting officer’s letter of November 21, 1951 relative to the sample table did not include any reference to the fact that the vertical flat surfaces of the table legs were not sanded smooth,[1] or any reference to the fact that the cottonwood table top, with its single coat of sealer and single coat of olive drab enamel, did not have a uniform, smooth, and refined finish.
13. A letter was written on November 21, 1951 by the Inspection Division of the Chicago Quartermaster Depot to the plaintiff relative to the prospective inspection of the folding camp tables to be supplied by the plaintiff under the contract. Accompanying this communication was a document entitled “A Brief Summary of the Mutual Bights and Obligations of the Contractor and the QMC Inspection Service.” This document stated in part as follows:
* * * [B]y virtue of the position of the Inspector in the Contractor’s plant, the burden of clarifying to the contractor the meaning of his Government contract insofar as it affects inspection duties, rests with the Inspection Service. A brief presentation of the mutual rights and obligations of the contractor and the Government on 13 key points is provided below:
POINT 1. The Contractor must know contract and specification requirements.
The contractor cannot comply with contract and specification requirements without a detailed knowledge of these basic documents. The supervisor, who is thoroughly conversant with the experience of numerous contractors on similar items is in an excellent position to clarify moot points in the specifications which have occasioned difficulties in the past. The Inspection Supervisor *111 and the contractor should carefully review and discuss the contractual documents, especially those requirements in the Government product which call for more exacting manufacturing techniques than regular commercial practice for similar types of product, and special types of plant equipment that may bé required.
POINT 2. The Contractor is responsible for the methods of production.
The contractor is responsible for determining how to manufacture product meeting contract requirements. The Inspector has no authority to advise or direct a contractor to use a particular method of production. If a contractor solicits and/or accepts advice from an Inspector, the contractor assumes sole responsibility for the results thereof.
point 3. The presence of QMC Inspectors in his plant does not relieve the Contractor of full responsibility for quality of product tendered for acceptance.
Complete responsibility for submitting to the Government only those supplies that fully meet contractual requirements rests with the contractor at all times. * * *
*****
point 5. The contractor has the right to appeal the decisions of the Inspector through the proper channels.
The contractor always has the right of appeal from any of the decisions of the Inspector. Since the Inspection Service is designated in the contract as the agency to which all matters pertaining to inspection will be referred, the contractor must adjust his differences on inspection matters solely through this agency. However, the contractor is entitled to go further than a mere challenge of the correctness of an inspection decision. He may grant the validity of a decision under the terms of the contract and still request relief in special cases. For example, he may apply for a waiver when he believes that supplies are suitable for the purpose intended, even though they have not been made in strict compliance to contractual requirements. Such cases are beyond the scope of the Inspection Service, since the sole person that can grant relief of a contract deviation is the Contracting Officer. The contractor must direct requests for waivers only to him.
14. An inspector was regularly assigned to the plaintiff’s plant by the Chicago Quartermaster Depot, and he began the *112 performance of his duties on or about November 28,1951. As of that time, approximately 600 folding camp tables had been constructed by the plaintiff and were ready for inspection.
15. The inspector took the position that the legs of the tables previously manufactured by the plaintiff failed to comply with paragraph 3.2 of the specifications because the vertical flat surfaces of the table legs (which the inspector regarded as the vertical edges of the table legs) had not been sanded smooth. The inspector also took the position that the tops of the tables, because of the lack of a uniform, smooth, and refined finish, were not sufficiently attractive in appearance to comply with the portion of paragraph 3.6 of the specifications stating that “The finished articles shall be * * * free from any defect which may affect appearance.”
16. The plaintiff acquiesced at the time in the positions taken by the inspector, as indicated in finding 15. The tables that had been completed were dismantled by the plaintiff; the vertical flat surfaces of the table legs were sanded smooth; and the table tops were processed further in order to give them a uniform, smooth, and refined finish. The additional processing of the table tops consisted, as a minimum, of a sanding operation and the application of a second coat of olive drab enamel (in addition to the coat of enamel initially applied by the plaintiff). In some instances, the addition of the second coat of enamel was not sufficient to provide a uniform, smooth, and refined finish; and, in those instances, the plaintiff applied a further coat of enamel (and occasionally more) to the table tops. When the reworking operations on the tables had been completed, the tables were reassembled, presented to the inspector for inspection, and accepted by the inspector.
17. For approximately 3 weeks after the arrival of the inspector mentioned in findings 14-16, the plaintiff manufactured the folding camp tables in accordance with that inspector’s interpretations of the specifications relating to table legs and table tops. The vertical flat surfaces of the table legs were sanded smooth; and in order that the table tops might have a uniform, smooth, and refined finish, they were given a coat of sealer, were then subjected to a sanding opera *113 tion, and thereafter were given two coats (and occasionally more) of olive drab enamel. Sanding operations were performed on the table tops between the applications, of enamel.
18. (a) The inspector mentioned in findings 14r-l7 was relieved by the Chicago Quartermaster Depot on December 6,1951 and was succeeded by a second inspector.
(b) Soon after the arrival of the second inspector, the plaintiff took up with him the matter of the correctness of the first inspector’s interpretations of the specifications as requiring that the vertical flat surfaces of the table legs be sanded smooth and that the table tops be given a uniform, smooth, and refined finish. The discussion of these matters between the plaintiff and the second inspector continued for several days. It was finally agreed that the plaintiff would make and show to the second inspector a sample lot of 15 folding camp tables constructed in accordance with the plaintiff’s original interpretations of the specifications relating to table legs and table tops — i. e., with the vertical sharp corners, but not the vertical flat surfaces, of the table legs sanded smooth, and with the table tops being given a single coat of sealer and a single coat of olive drab enamel.
(c) The sample lot of 15 folding camp tables mentioned in paragraph (b) of this finding was constructed by the plaintiff and shown to the second inspector on or about December 19, 1951. The second inspector, after examining these tables, expressed the opinion that they met the requirements of the specifications; and he said that similar tables presented to him thereafter for inspection would be accepted.
(d) Beginning on or about December 20, 1951, and continuing until the completion of performance under the contract, the plaintiff manufactured the folding camp tables in accordance with its original interpretations of the specifications relating to table legs and table tops. The vertical sharp corners, but not the vertical flat surfaces, of the table legs were sanded smooth; and the table tops were given a single coat of sealer and a single coat of olive drab enamel. The tables thus manufactured were submitted to and accepted by the second inspector.
*114 19. On December 19, 1951, an official of the plaintiff went to Chicago and conferred with the contracting officer (as well as with other personnel of the defendant). The plaintiff’s representative stated to the contracting officer that the first inspector’s interpretations of the specifications had resulted in increased costs not originally anticipated by the plaintiff. The contracting officer replied that the plaintiff should have called upon him at once for clarification of the matter, since he was, as stated in the contract, the single authority as contracting officer and all others were subordinate to him. The plaintiff’s representative also said that the plaintiff intended to submit a request for the repayment of its losses; and the contracting officer indicated in response that he would not regard such a request as justified, but that he was not the final authority.
20. Performance under the contract was completed by the plaintiff on January 2, 1952. Payment of the full contract price, as changed by Change Order No. 1, was subsequently made to the plaintiff by the defendant.
21. A claim “for reimbursement in the sum of $104,964.70 to cover the loss sustained * * * in completing this contract” was submitted by the plaintiff to the contracting officer on June 14,1952. A covering letter from the plaintiff’s attorney asked that he be advised “when it will be convenient for you to afford us an opportunity to be heard in connection with this claim.”
22. In a letter dated August 18,1952 from the contracting officer to the plaintiff’s attorney, the latter was advised in part as follows:
The undersigned has completed his investigation of the claim of The Woodcraft Corporation, as presented under cover of your letter of 14 June 1952, and has determined that such claim for alleged breach of contract is properly presentable to the General Accounting Office since the contract and payments thereon have been completed. Therefore, such documentation as is required to present your claim will be forwarded therewith to that office for direct settlement.
# * ij; # ijs
With regard to the hearing requested, you are advised that the undersigned is available at any time. *115 However, since the matter will be one within the jurisdiction of the General Accounting Office it does not appear that such meeting will serve any useful purpose.
23. On December 19,1952, the contracting officer prepared ' an “Administrative Report of Contracting Officer” concerning the plaintiff’s claim in the amount of $104,964.70. This report stated (among other things) as follows:
5. When the contractor’s claim was first brought to the attention of the undersigned the matter of possible jurisdiction of the Armed Services Board of Contract Appeals was considered, but it was decided that under the decision of the Board in re Fiske-Carter Construction Company (3 CCF 415) and the authorities therein cited, none of the contractor’s claims rest on any provision of the contract providing for payment of increased compensation to the contractor. The claims are for unliquidated damages for breaches of contract or other wrongful acts of the Government. It was therefore decided to process the claim in accordance with AR 35-670.
$ $ $ ‡ $
9. The undersigned considers the Memo report from inspection as sufficient answer to the remainder of the claim that deals with inspection difficulties, and on the basis of that report, considers the complaints against Inspection to be without merit. One matter in the report is worthy of especial notice. Inspector Smith, against whom most complaints are directed, was assigned to contractor’s plant only for the period 27 November to 6 December 1951, and accepted all eight lots submitted to him during this period.
# # ❖
14. In conclusion, and while it is conceded that the contractor may have lost money in performing the contract, it is not considered that its loss was due to any breach of contract or wrongdoing on the part of the Government and it is recommended that the claim be disallowed.
24. On January 14,1953, the Chief of Finance of the Army forwarded the plaintiff’s claim in the amount of $104,964.70 to the General Accounting Office for direct settlement.
25. (a) By a settlement certificate dated May 29,1953, the Comptroller General disallowed the plaintiff’s claim.
*116 (b) Subsequently, an assistant general counsel of the General Accounting Office addressed to the plaintiff’s attorney on June 28,1954 a letter which stated in part as follows:
In your 20-page brief presenting the claim of the company various contentions were made. One such contention was that the contractor was compelled to perform work over and above that required by the contract because of unreasonable and unjustified demands of Government inspectors. The contracting officer made a finding of fact with regard to that contention but it was not shown by the record before this Office whether a copy of the report and recommendation of the contracting officer was ever furnished the contractor as required by article 12 of the contract, which provides that all disputes concerning questions of fact arising under the contract, and not disposed of by mutual agreement, shall be decided by the contracting officer, who shall mail to the contractor a written notification of his determination, and that within 80 days therefrom the contractor may appeal to the Secretary of the Army whose decision shall be final and conclusive on the parties. Accordingly, since your claim as presented involves inquiries of fact and since under the law the disputes-clause procedure is mandatory in such a situation, the matter necessarily was referred to the Department of the Army for appropriate action in accordance with such procedure. See United States v. Callahan Walker Co., 317 U. S. 56; and United States v. Holpuch Co., 328 U. S. 234.
26. In a letter dated January 5, 1954, the plaintiff’s attorney wrote to the Comptroller General concerning the plaintiff’s claim and asked that the Comptroller General “review the handling of this claim inasmuch as it is felt that the facts have been misapprehended in the General Accounting Office, and no opportunity afforded to the claimant to be heard, although request therefor was made.” This letter stated (among other things) that the plaintiff had “sustained a loss amounting to $115,415.16 instead of a loss as set forth in the original claim of $104,964.70.”
27. In a letter dated May 11, 1954 from the General Accounting Office to the plaintiff, the latter was advised as follows:
Since there appears to be a disagreement between the administrative officers and you as to the facts and since,pursuant to article 12 of the contract the Secretary of *117 the Army, or his duly authorized representative, alone is vested with the authority to determine finally disputes arising under the contract, the Department of the Army is today being requested to take appropriate action in settling this factual dispute.
28. A letter dated June 16, 1954 from the successor con-contracting officer to the plaintiff stated in part as follows:
At the request of the General Accounting Office, of which you have been advised, there is inclosed herewith the complete Administrative Eeport of the Contracting Officer as presented to that Office when processing your claim.
If in your opinion the findings and decision set _ forth in the Eeport involve a dispute concerning a question of fact, you are hereby notified that in accordance with the provisions of General Provision 12 “Disputes” of the above-numbered contract you may appeal from these findings and decision to the Secretary of the Army. * * *
29. The plaintiff’s attorney forwarded to the Secretary of the Army on July 15,1954 a document entitled “Appeal to the Secretary of the Army from Administrative Eeport of Contracting Officer.” In the appeal, it was stated .that the plaintiff sustained a loss of $115,415.16 in furnishing tables pursuant to the contract.
30. At a hearing before the Armed Services Board of Contract Appeals, the plaintiff, in effect, reduced the amount involved in the appeal to $38,362.64.
31. A decision on the plaintiff’s appeal was rendered by the Armed Services Board of Contract Appeals on November 17,1955. The appeal was denied. In its decision, the Board stated in part as follows:
Appellant’s admitted initial interpretation and understanding of the specification requirements was correct. It must therefore be regarded that appellant knew or should have known that the suggestion of Government Inspector No. 1, with respect to sanding the faces of the table legs and putting enamel on the table top in excess of one coat, involved extra operations not called for or required of appellant under the contract. Appellant must also be held to have been aware of the fact that, under the contract as written, inclusion of these operations into the specification requirements necessitated issuance by the contracting officer of a change order in *118 writing so providing. Nevertheless, as shown by the evidence, appellant adopted these suggestions for its own convenience or reason expedient into itself, without protesting or demanding change order to cover these additional operations. Appellant would clothe this inspector with authority to order such extras or changes in specification. However, there is no evidence that this inspector had authorization to do other than accept or reject units as meeting or not meeting specification requirements and to submit written report of his action in this respect to the contracting officer or other proper Government official. And no act on the part of the Government has been shown from which larger authority in the inspector could justifiably be implied.
32. A motion by the plaintiff for reconsideration was denied by.the Armed Services Board of Contract Appeals on April 6,1956.
33. (a) The cost to the plaintiff during the period November 28-December 19, 1951 of dismantling and reassembling tables, sanding the vertical flat surfaces of table legs, sanding table tops, and applying a second coat of olive drab enamel (and occasionally more) to table tops, in order to comply with the first inspector’s interpretations of the specifications relating to table legs and table tops, amounted to a total of $11,651.44. This total was made up of the following items:

(b) The evidence does not show how the figures set out in paragraph (a) of this finding should be allocated as between the operations pertaining to table legs and the operations pertaining to table tops (except that the cost of the extra enamel should be allocated to table tops).
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and its petition is therefore dismissed.

 The letter did mention that the grain of the wood in some of the table legs had been torn in the manufacturing process.