James F. SEGER et al.

v.

The UNITED STATES.

No. 359–64.

United States Court of Claims.

Nov. 10, 1972.

Jordan N. Peckham, Chico, Cal., atty. of record, for plaintiffs.

Edward J. Friedlander, Washington, D. C., with whom was Asst. Atty. Gen. Harlington Wood, Jr., for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

## ON PLAINTIFFS' MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case was referred to Trial Commissioner Kenneth R. Harkins with directions to file his opinion on the issues of plaintiffs' motion and defendant's cross-motion for summary judgment under the order of reference and Rule 166(c). The commissioner has done so in an opinion and report filed on May 4, 1972, wherein such facts as are necessary to the opinion are set forth. Plaintiffs filed a request for review of the report and opinion by the court, defendant urged its adoption and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the opinion and recommended conclusion of the trial commissioner it hereby adopts the same, as hereinafter set forth, as the basis for its judgment in this case. Therefore, plaintiffs' motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted as to plaintiffs' first and third causes of action, defendant's motion to dismiss is granted as to plaintiffs' second cause of action and plaintiffs' petition is dismissed.

## OPINION OF COMMISSIONER

HARKINS, Commissioner:

This contract case is before the court on cross-motions for summary judgment under Rule 163(b). Plaintiffs seek review pursuant to the standards of Section 1 of the Wunderlich Act,[1] of decisions by the Corps of Engineers Board of Contract Appeals,[2] which denied claims on behalf of a principal subcontractor for additional compensation for extra work on changes and for 51 days' standby and delay costs.

The prime contract, awarded May 8, 1958, No. DA–04–167–CIVENG–58–65, was for channel improvements and levee construction on Little Chico and Butte Creeks in Butte County, California. Plaintiff James F. Seger was awarded a subcontract on May 20, 1958, for alteration and construction of various structures and placement of stone bank protection. Plaintiff Seger's subcontract included 88 of the 174 work items of the prime contract, and represented 46 percent of the dollar value of the work.[3] The prime contract was to be completed by November 14, 1958 (185 days). Completion time was extended 49 days to December 24, 1958 (234 days). Seger's subcontract had a completion date of November 1, 1958. Subcontract work was completed on December 19, 1958, after 136 actual working days.

There were many changes before completion of the work. Twenty-six Change Order Modifications to the original prime contract have been negotiated and accepted: Nos. 1 through 21 for changes recognized as such during the job; Nos. 22 through 24 to adjust claims filed after completion of the work, and Nos. 25 and 26 as a result of the first board opinion on January 13, 1961.

On January 13, 1961, the board denied, under the *Severin* rule,[4] Mr. Seger's claims for an equitable adjustment for 51 days' delay. The subcontractor's claims for extra costs for changed work were considered as part of the prime contractor's claim and allowed in part.[5]

On March 28, 1969, on remand from the Court of Claims, the board denied Mr. Seger's claims for extra work on the ground that all such claims had been settled and paid in the 26 Modifications to the prime contract, and on the merits denied, for failure of proof, all claims for 51 days' standby and delay, except for a minor adjustment for the standby time of a pipe layer and a labor foreman for 2 days.[6]

In this court, plaintiffs' Second Amended Petition seeks relief based on three causes of action: (1) $155,526.50 for Seger's extra work, time, materials and delays for Government ordered changes; (2) indemnification for Ukropina-Polich-Kral and Darrough and Sons for any liability to Seger that may be ordered in an action brought by Seger in Butte County, California, Superior Court, to recover the reasonable value of the same extra work, time, materials and delays;[7] and (3) reasonable value of the same extra work, time, and materials and delays on the theory that direct dealing by the Government caused the original prime contract to be superseded or supplemented by express oral contracts and implied contracts with each plaintiff.

1. 68 Stat. 81, 41 U.S.C. § 321 (1970).

2. B. J. Ukropina, T. P. Polich, Steve Kral & John R. Ukropina d/b/a Ukropina-Polich-Kral & W. H. Darrough & Sons, Joint Venturers, Eng. BCA No. 1710, January 13, 1961, and March 28, 1969; 69–1 BCA ¶ 7591.

3. Eng BCA No. 1710, March 28, 1969, p. 11 (hereinafter referred to as 2d Bd. Op.; the opinion of January 13, 1961, is referred to as 1st Bd.Op.).

4. Severin v. United States, 99 Ct.Cl. 435 (1943), cert. denied, 322 U.S. 733, 64 S.Ct. 1045, 88 L.Ed. 1567 (1944); 1st Bd.Op. pp. 3–8.

5. 1st Bd.Op. pp. 23–26.

6. 2d Bd.Op. pp. 8, 28.

7. James F. Seger v. Ukropina-Polich-Kral & W. H. Darrough & Sons, a joint venture, No. 34,803, Superior Court, Butte County, California.

The questions presented are whether there is substantial evidence in the administrative record to support the findings by the Corps of Engineers Board of Contract Appeals that (1) modifications to the prime contract have included payment for all of Seger's claims for extra work performed pursuant to Government ordered changes; (2) Seger's tender of proof of time and costs claimed to be due subcontractor was useless as a basis to determine an equitable adjustment; (3) only one of Seger's claims for standby or delay time could be considered to be caused by unreasonable acts of the Government; (4) on an overall basis, Seger was not unreasonably delayed or caused additional expense by Government acts which can be equated to a partial suspension of work for the convenience of the Government; and (5) Government personnel did not act toward Seger other than as a subcontractor. Additional questions are whether the exculpatory provisions in the subcontract require denial of Seger's claim under the *Severin* rule,[8] and whether the prime contractor should be indemnified by the Government for any liability Seger may establish in the California State Court action.

The board's decision in its second opinion is legally correct and is supported by substantial evidence. Plaintiffs' Motion for Summary Judgment should be denied and Defendant's Cross-Motion should be granted as to plaintiffs' first and third causes of action. Plaintiffs' second clause of action on behalf of Ukropina should be dismissed.

*History of Litigation.* The course of this case has been long, tortuous, and characterized by extensive delays, which for the most part are attributable to plaintiffs' procrastinations and lack of diligence. This court has been extremely tolerant in its indulgence of plaintiffs' indifference to requests for information and for action.

In his original petition, filed October 23, 1964, plaintiff Seger brought an action on his own behalf on a theory of express or implied contract to recover $155,526.50 for extra work, time and materials over and above the prime contract specifications. Defendant answered on February 23, 1965, and the Commissioner's Pretrial Order issued on February 25, 1965. After three extensions requested by plaintiff,[9] plaintiff's pretrial submission was filed June 10, 1965.

On October 1, 1965, defendant moved for summary judgment on the ground that information in plaintiff Seger's contemporaneous action in Butte County, California, Superior Court, established that all of the work and alleged delays were within the scope of the prime contract, were directed by the prime contractor, and that there was no privity of the contract between plaintiff Seger and the Government.[10] By Order on November 7, 1966, this court denied Defendant's Motion for Summary Judgment, allowed plaintiff Seger 30 days to join the prime contractor as plaintiff, and to amend the petition to allege specifically facts claimed to show an implied contract. This court suspended the case for 180 days to permit the prime contractor to obtain a decision on behalf of the subcontractor before the Corps of Engineers Board of Contract Appeals " * * * on the claims for delay that can be allowed under the suspension of work clauses and for extra work that should have been covered by a change order."[11] On December 6, 1966, plaintiffs Seger and Ukropina-Polich-Kral

---

8. Severin v. United States, *supra* note 4; Blount Bros. Constr. Co. v. United States, 348 F.2d 471, 172 Ct.Cl. 1 (1965).

9. April 26, 1965, May 26, 1965, and June 7, 1965.

10. Plaintiff requested two time extensions, on November 15, 1965, and February 4, 1966, to respond to defendant's motion, and filed its opposition on February 17, 1966.

11. The court's November 7, 1966, Order read in part as follows:

"IT IS FURTHER ORDERED that plaintiff's motion to join new party plaintiff and the application by Ukropina-Polich-Kral and Darrough and Sons, a

and Darrough and Sons, a Joint Venture, filed a First Amended Petition that set forth three causes of action.

The Corps of Engineers Board of Contract Appeals took prompt action to implement the court's November 7, 1966, Order. After many delays, a 4-day full-scale adversary hearing was held in July 1968, in which testimony and documentary evidence were received and arrangements were made, by stipulation, for an audit of Seger's existing business records and for review and comments on such audit report by the Government. The board's decision was rendered on March 28, 1969, and forwarded to the court in April 1969 by defendant.

Plaintiffs' First Amended Petition, filed on December 6, 1966, did not comply with Rule 95 of the court in effect at that time, nor with new Rule 162(a) effective September 1, 1969, in that it did not make clear the relationship of the Wunderlich Act to the relief sought.[12] On May 29, 1969, defendant gave notice of its intention to file a motion to dismiss for failure to comply with requirements of the court rules for Wunderlich Act cases. From June 12, 1969, to September 23, 1969, four letters were sent to plaintiffs to ascertain their intention with respect to further amendment of the petition. On September 23, 1969, plaintiffs were referred to the rules and advised that unless a satisfactory explanation was given by October 6, 1969, involuntary dismissal under Rule 102 for failure to prosecute would be recommended. On October 14, 1969, with no reply from plaintiffs, defendant filed its motion to dismiss the First Amended Petition.[13]

This court, on February 9, 1970, heard argument on its rule to show cause why the case should not be dismissed and, on February 17, 1970, granted plaintiffs' oral request to amend the Petition. Plaintiffs' Second Amended Petition was filed on February 17, 1970.[14]

---

Joint Venture, for intervention, be and the same are allowed to the extent that Ukropina-Polich-Kral and Darrough and Sons, a Joint Venture, be and the same is made a party plaintiff to this action so that it can sue under the prime contract on behalf of James F. Seger, the subcontractor; that plaintiff is allowed thirty (30) days from the date hereof to file an amendment to the petition specifically alleging the facts claimed to show an implied contract; and, that the case be and the same is suspended for one hundred eighty (180) days from the date hereof in order that Ukropina-Polich-Kral and Darrough and Sons, a Joint Venture, as plaintiff, may obtain a decision on behalf of James F. Seger, the subcontractor, before the Engineer Board of Contract Appeals on the claims for delay that can be allowed under the suspension of work clause and for extra work that should have been covered by a change order."

12. The First Amended Petition did not contain allegations as to the standard "Changes," "Disputes," or "Suspension of Work" clauses of the prime contract, did not refer to the board's decision, and did not identify the provisions of the Wunderlich Act that applied to the relief sought or specify which findings of fact in the board's decision were not entitled to finality.

13. On November 17, 1969, plaintiffs requested an extension to respond to defendant's motion to dismiss. On December 30, 1969, the commissioner advised the Secretary of the Court that plaintiffs had failed to respond to defendant's motion to dismiss, notwithstanding the extension, and stated:

"I have had considerable difficulty in getting the plaintiff to respond to numerous letters and other requirements, yet it would be a pity to throw the plaintiff out of court entirely for his procedural remissness. Eventually, if the plaintiff were to amend his petition in the proper way, this is the kind of a case which would be submitted to the court for Wunderlich Act review via cross-motions for summary judgment, but for some unaccountable reason I cannot seem to get the necessary action out of plaintiff's counsel so as to bring it to the stage of readiness for review."

14. In its Order the court warned the plaintiffs to be more diligent and stated:

"IT IS ORDERED that the said rule to show cause why this case should not be dismissed for failure to respond to defendant's motion to dismiss the amended petition be and the same is discharged,

Defendant answered the Second Amended Petition on March 19, 1970, and the administrative record was filed with the court on March 26, 1970. On September 30, 1970, the plaintiffs were directed to file a dispositive motion pursuant to Rule 165(b)(1) on or before November 2, 1970. The Motion for Summary Judgment filed by plaintiffs on November 2, 1970, on its face did not comply with the requirements of Rule 163. Plaintiffs' Motion did not state reasons for its challenge of the administrative decision on errors of law, or cite authorities relied upon. On factual issues, plaintiffs' Motion did not state why the board's findings were not entitled to finality nor cite portions of the record to refute the board's findings.

Notwithstanding these deficiencies, on January 14, 1971, defendant responded to plaintiffs' Motion and filed its Cross-Motion for Summary Judgment. Plaintiffs did not reply. On February 19 plaintiffs were advised that the Motion for Summary Judgment did not comply with Rule 163, and that time for plaintiffs' reply to defendant had expired February 14, 1971.

Plaintiffs waited until September 17, 1971, to request leave to file out of time. This request was granted and plaintiffs were directed to file memoranda in support of the November 2, 1970, Motion, as required by Rule 163(b)(3), on or before October 22, 1971.

On October 29, 1971, Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment was filed. In the Memorandum, plaintiffs made grave and intemperate charges against the member of the Board of Contract Appeals that conducted the hearings, and the attorney for the Corps of Engineers, and challenged the conduct of the administrative proceedings.[15] Personal attacks of this nature are deplored and properly would be subject to a motion to strike. At this stage of this ancient proceeding, however, such a course would serve to delay the case further.[16]

Upon review of the entire administrative record, and the board's opinions, it is clear that such charges are unwarranted. The administrative record establishes that the attorney for the Corps of Engineers and the board members in the conduct of this proceeding have maintained high adjudicatory standards. The Corps of Engineers Board of Contract Appeals is to be commended for the dispatch with which it responded to the court's November 7, 1966, Order and for the high standards maintained in its hearing procedures in the disposition of these claims.

*Facts.* The prime contract, dated May 8, 1958, was awarded to Ukropina-Polich-Kral and W. H. Darrough and Sons, a Joint Venture, in Yuba City, California.[17] The prime contract incor-

---

defendant's said motion to dismiss the amended petition is denied without prejudice, and plaintiffs' said motion for leave to file a second amended petition is granted, provided, however, that if hereafter plaintiffs do not promptly respond to orders and communications of the trial commissioner the case may be summarily dismissed without further notice to plaintiffs."

15. Plaintiffs charge that "Plaintiffs did not receive anything remotely approaching an impartial hearing * * *," that "The attorney for the Corps lied * * *," that the " * * * entire defense of this case was carried on a thick smog of chicanery and deceit * * *," (p. 2) and

"In addition, the hearing officer makes such outrageous statements in his decision that all taken together, it is obvious that the hearing officer had already decided the case in favor of his good friend Clyde before the hearing started, and the hearing itself was nothing but a staged performance like a purge trial in Russia." (p. 3)

16. Algonac Mfg. Co. v. United States, 428 F.2d 1241, 1245, 192 Ct.Cl. 649, 655–657 (1970).

17. The joint venture prime contractor is hereafter referred to as Ukropina. B. J. Ukropina, T. P. Polich, Steve Kral and John R. Ukropina are individuals d/b/a Ukropina-Polich-Kral. W. H.

porated Standard Form 23A, General Provisions (Construction Contracts), March 1953 Edition, and Specification No. 2380, Serial No. CIVENG–04–167–58–12, dated April 29, 1958. The prime contract thus incorporated the standard, at that time, "Changes," "Changed Conditions," "Disputes," and "Suspension of Work" articles.[18]

James F. Seger was awarded the subcontract for the alteration or construction of various structures and for the placement of stone bank protection on May 20, 1958. "General Conditions," incorporated in the subcontract, included a clause that bound the subcontractor to all the terms and conditions of the prime contract,[19] and an exculpatory clause related to stoppage or suspension of work.[20] The Special Conditions of the subcontract obligated the subcontractor to be responsible for all risks of every description connected with the work, and for all expenses related to the suspension or discontinuance of the work.[21]

The project involved construction of channel improvements and levee construction on Little Chico and Butte Creeks in Butte County, California,[12] extended over an area approximately 7 miles from end to end, and required work on both banks of the channel and Butte Creek. The nature of the project and the course of work thereunder are described in detail in the board's opinions and need only be summarized here.

In addition to Seger's subcontract for alteration or construction of various structures and placement of stone bank protection, the prime contractor subcontracted the clearing work to another firm. The principal items of excavation and embankment and miscellaneous work to remove, salvage, or waste parts of ex-

Darrough and Sons is a partnership composed of William H. Darrough, Jack M. Darrough, James E. Darrough and Robert W. Darrough. As a result of this project, by the time of the second board hearing, James F. Seger Co. and W. H. Darrough and Sons had gone out of business.

18. Standard Form 23A (March 1953), Articles 3, 4, 6 (Substitute); Specification No. 2380, GC 11.

19. GX–6; "4. Assumption of Principal Contract: The work to be done hereunder is a portion of the work required of Contractor under the General Contract referred to in the Special Conditions hereof. In so far as applicable, Subcontractor shall be bound by all the terms and conditions of the General Contract, and its plans and specifications, and shall strictly comply therewith. All rights and remedies reserved to·Owner under the General Contract shall apply to and be possessed by Contractor in its dealings with Subcontractor."

20. "8. Stoppage or Suspension of Work: Subcontractor shall not make any claim against Contractor or Owner for any delay caused by any act or order of Owner or Contractor, and Subcontractor expressly waives any and all claims for damages for any such delays. If Owner for any cause stops or suspends the work under the General Contract, or if Contractor for any cause stops or sus-pends the work hereunder, Contractor may order Subcontractor to stop or suspend work hereunder and Contractor shall not be liable to Subcontractor in any way for such stoppage or suspension, but shall pay to Subcontractor, as herein provided and after Contractor has been paid by Owner, for such work as Subcontractor shall have done before the work was stopped or suspended."

21. Paragraph 1. "Worked [sic] To Be Performed and Payment Therefore [sic], of the Subcontract states, in part: "And in consideration * * *. Subcontractor agrees to receive and accept as full compensation for doing all work and furnishing all materials contemplated and embraced in this agreement; for all loss or damage arising out of the nature of the work hereinbelow listed or from the action of the elements or from any unforeseen difficulties or obstructions which may arise or be encountered in the prosecution of the work until its acceptance by Owner; for all risks of every description connected with the work; for all expenses incurred by or in consequence of the suspension or discontinuance of the work; and for well and faithfully completing the work and the whole thereof in the manner and according to the requirements of the Contractor and Owner and the instructions of the engineer in charge of said work, at the following prices * * *."

22. Specification No. 2380, Part I; GX–1.

isting structures were retained by the prime contractor.

The project involved cooperation with state and local authorities as to rights-of-way, and other activities, and for funding to cover the cost of appurtenant work. The work included construction or modification of numerous irrigation structures, owned by various individuals with property abutting the project right-of-way. Completion of the overall project thus required performance of particular work items in such time limits that would enable other agencies or their contractors to accomplish work that was the obligation of local interests as local cooperation.

The prime contractor was obligated for certain features of the overall work within designated periods after start of work. This would permit the Butte County Highway Department and the Southern Pacific Railroad Company to perform necessary work on bridges and approaches.[23] These obligations included work at separated points. The prime contractor had to schedule its work and coordinate Seger's work with other phases of the project.

As the work progressed, changes ordered by the Government became more and more frequent. The board found that these changes, in general, consisted of (1) field changes to adapt the work to the conditions encountered, and (2) design changes to structures occasioned by discovery that a structure as originally specified would not accomplish its intended purpose or did not meet the requirements of the owner of existing facilities.[24] The board found a total of 138 structure changes were made during the life of the contract, of which 72 were fence changes, outside the channel and embankment area, and 66 structure changes that affected the prime contractor's and Seger's work within the channel and embankment areas.[25] Mr. Seger contends that there were a minimum of 200 changes, some being interim changes on the same structure before the structures were completed.

*Severin Rule.* The board, in its January 13, 1961, decision, denied Seger's claim for costs incurred by reason of Government ordered delays on the ground that the subcontract provisions made the *Severin* rule applicable.[26] In the first hearing, Seger sought to establish that a course of direct dealings with Government officials had created an express or implied contract. The board, however, found that Seger had no privity of contract with the Government, and that such dealings that existed between the Government and the subcontractor were informal and for convenience and were not sufficient to establish the existence of an independent contract.[27]

This court, in its November 7, 1966, Order, without oral argument denied Defendant's Motion for Summary Judgment, on the basis of *Blount* and *Roscoe Engineering*.[28] Notwithstanding this ruling, the second hearing and the board's second order indicate a belief that the *Severin* rule may continue to have vitality in its application to the ex-

---

23. See Specification 2380, Part III, SC–01, Commencement, Prosecution, and Completion, and SC–33, Irrigation and Flood Control Requirements.

24. 2d Op. p. 6.

25. 1st Op. p. 10.

26. 1st Op. pp. 4–8.

27. 1st Op. p. 8.

28. Blount Bros. Constr. Co. v. United States, *supra* note 8; and *Roscoe Eng'r Corp.*, ASBCA No. 9070, 65–2 BCA ¶ 4992. In *Blount*, the *Severin* rule was explained as follows:

" '* * * a prime contractor may sue the Government for damages incurred by one of its subcontractors through the fault of the Government * * * only when the prime contractor has reimbursed its subcontractor for the latter's damages or remains liable for such reimbursement in the future. These are the only ways in which the damages of the subcontractor can become, in turn, the damages of the prime contractor, for which recovery may be had against the Government. [Citations omitted.] * * *' " [348 F.2d at 471, 172 Ct.Cl. at 3.]

culpatory clauses in Seger's subcontract.[29]

It is time to put the *Severin* rule to rest insofar as subcontractor claims are asserted as an equitable adjustment under the provisions of a prime contract with the Government.[30]

Seger's subcontract contained extensive provisions to protect the prime contractor from liability for delay damages. The subcontractor agreed that his quoted prices were full compensation for all expenses incurred by or in consequence of the " * * * suspension or discontinuance of the work," and that no claim would be made against the prime contractor or the Government for any delay caused by the Government or the prime contractor.[31] In the event either the Government or the prime contractor stopped or suspended work, the prime contractor was not to be liable in any way for such stoppage or suspension, and if the prime contractor was compensated by the Government, Seger was eligible to be paid only for work " * * * done before the work was stopped or suspended."

■ The *Blount* case establishes that when the subcontractor's delay claims are eligible for inclusion in an equitable adjustment within the terms of the prime contract, the *Severin* rule does not apply. The rule continues to apply in cases where the prime contractor asserts an action for breach of contract. Exculpatory clauses in the subcontract were intended to insulate the prime contractor from the possibility of being liable to his subcontractor for delay caused by the Government, and yet unable to recover from the Government because the prime contract did not provide for an equitable adjustment for delay claims. The need for the exculpatory clause is clear when the prime contractor's only remedy against the Government is an action for breach of contract. When the prime contract, however, provides that the Government will compensate the prime contractor for unreasonable delay costs, the necessity for such protection does not exist.

■ The *Severin* rule where it is applicable produces harsh results. Where the provisions of the prime contract provide a mechanism that in a proper case can mitigate injury to the subcontractor, and such provisions are incorporated by reference in the subcontract, abstract legal doctrines of privity and exculpatory clauses in the subcontract do not control.[32]

*Express or Implied Contracts.* Plaintiffs' third cause of action contends that direct dealings between employees of both the prime contractor and the subcontractor and Government representatives created a relationship in which the original prime contract was superseded or supplemented by express oral contracts and implied contracts with each plaintiff. This aspect of the claim in-

29. In the prehearing conference on May 7, 1968, Government counsel preserved this defense for the Government, because of the specific provisions of Seger's subcontract in relationship to the facts of this case. The board noted that it interpreted the November 7, 1966, Order to require separate findings on the merits of Seger's total claim " * * * without reference to or consideration of the legal defense previously relied upon by the Government." (2d Op. p. 4.)

30. This case does not deal with, and the court does not pass upon, an exculpatory clause which explicitly and unequivocally provided that the prime contractor was not in any way liable to the subcontractor for delays to the subcontrac-tor which were compensable through an equitable adjustment under the contract. [Footnote by the court.]

31. *Supra* note 20.

32. *Blount, supra* note 8; Morrison-Knudsen Co. v. United States, 397 F.2d 826, 852, 184 Ct.Cl. 661, 703 (1968). Various boards after *Blount* have held that the *Severin* rule is not applicable to claims for equitable relief under contract clauses that provide for a price adjustment. *Roscoe Eng'r Corp., supra* note 28; Unicon Management Corp., VACAB No. 470, 65–2 BCA 5138; C. W. Regan, Inc. & Compudyne Corp., NASA BCA Nos. 565–19 and 765–24, 67–1 BCA 6151; R. C. Hughes Elec. Co., IBCA 509–8–65, 66–2 BCA 5989.

volves the contention that the excessive number of changes in design and location of the various structures that were ordered by the Government resulted in a situation in which the Government abandoned the original prime contract and created a new project which, as changed, implied new contracts.

In both opinions, the board examined and rejected the assertion that direct dealings with officials of the Government had established privity of contract between the subcontractor and the Government. In the first opinion, the board found that all formal contract action was between the Government and the prime contractor, and that the informal dealings that did occur were directly with the subcontractor for convenience of the parties and were not sufficient to create new or independent contracts with the Government.[33]

In the second opinion, the board again found that all formal actions pertaining to changes, payments, or other contract administrative acts were properly channeled through the prime contractor. The board found that there was no basis in the record to support a finding that Government personnel acted toward Seger other than as a subcontractor.[34]

 Substantial evidence in the administrative record supports this finding by the board and, plaintiffs' assertion to the contrary, the record is barren of any creditable proof of direct dealings that would serve as a predicate for oral express or implied contracts. No evidence is adduced to show new contractual commitments to Seger by authorized agents of the Government. At most, the record establishes that the dealings between Government representatives and Seger were informal arrangements for the mutual convenience of the parties in performance of the project.[35]

Plaintiff defines the principal issue in the case as " * * * the extent to which changes in design and location will be tolerated before the contractor may elect to treat the original contract as abandoned, and to treat the change orders as creating an entirely new contract." [36] The administrative record does not clearly establish the exact number of changes that were ordered to be made during the course of the project. Mr. Seger testified that in view of the numerous interim changes on the same structure, there were a minimum of 200 design changes ordered in performance of the contract.

In its first opinion, the board found that there were 138 structure changes made during the life of the contract. Since 72 were found to be changes in fences outside of the channel and embankment area, 66 would be structure changes that affected the prime contractor's work and Seger's work within the channel and the embankment areas. In addition, in its first opinion, the board found that there were 16 miscellaneous changes which were not made the subject of contract modifications but which were compensated for as extra work at contract unit prices.[37] In its second opinion, the board did not believe it necessary to determine the precise number of changes that were directed to be made by the Government, in the light of its determination that the Government had made an equitable adjustment with respect to all claims for extra or changed work performed under the "Changes" or "Changed Conditions" articles of the prime contract that had been advanced by or on behalf of Seger.[38]

 The standard "Changes" article does not place a numerical limit on authorized changes. Number alone could rarely be the measure of unreasonable

---

33. 1st Op. p. 8.

34. 2d Op. p. 12.

35. Woodcraft Corp. v. United States, 173 F.Supp. 613, 146 Ct.Cl. 101 (1959); Hargrave v. United States, 130 F.Supp. 598, 132 Ct.Cl. 73 (1955).

36. Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment, p. 11.

37. 1st Op. p. 10.

38. 2d Op. p. 6.

changes or an abuse of authority. Whatever may be the precise number of changes that were involved in Seger's work, no evidence has been cited, and nothing has been found in the record that would justify a conclusion that the number of changes went beyond the permissible limits of the contracting officer's discretion. Defendant has issued 26 modifications to the original contract. These modifications include changes in the structures and other work subcontracted to Seger. Although the changes ordered by the defendant were extensive, the record does not support a finding that the project as completed was substantially different than the project originally contracted for. Unless the changes resulted in a product essentially different from that originally contemplated, the changes could not give rise to a new or different contract.[39]

Plaintiff has not established that the number of changes ordered were an unreasonable exercise of the contracting officer's discretion. The changes ordered were not cardinal in nature. The channel improvements and levee construction on Little Chico and Butte Creek when finished involved the same 7-mile area and, as changed, substantially the same structures and facilities as in the original bid solicitation.[40]

*Exhibit A-2.* Seger's claim was presented in a 57-page document identified as appellants' exhibit A-2. This exhibit has been the primary support of the claim, and served as a focus for other evidence and testimony at the board hearing.[41]

Exhibits introduced into the record of the first board hearing were destroyed in Defense Department record disposal routines, and only the first hearing transcript was available at the start of the second hearing. Copies of some of the destroyed exhibits were located during the course of the second hearing.

In addition to exhibit A-2 in the second hearing, Mr. Seger testified in support of his claim, and called two witnesses: William E. Cowan, General Superintendent of Darrough and Sons on the project, and Ray W. White, an equipment supplier to Seger who coordinated Seger's work on the project with the work of Darrough and Sons. Mr. Seger produced three packing boxes of records and a ledger which were identified as Seger's business records for the project that were still available.[42] These business records were the subject of an audit and audit report which, after the hearing, were incorporated in the administrative record along with the Government's comments thereon.

Exhibit A-2 is described by plaintiff as a summary of a huge volume of business records kept in the ordinary course of business. These business records, under the supervision and control of Mr. Seger, included the individual laborer's time sheets, foreman reports, superintendent's logs and records of change orders. This document was prepared within 30 days after completion of the project, and purports to be a summary and abstract of damages prepared from original business records. Plaintiff contends that exhibit A-2 " * * * con-

---

39. Aragona Constr. Co. v. United States, 165 Ct.Cl. 382, 391 (1964).

40. Aragona Constr. Co. v. United States, *supra* note 39; J. D. Hedin Constr. Co. v. United States, 347 F.2d 235, 257–258, 171 Ct.Cl. 70, 105–106 (1965).

41. In the second board hearing this document is referred to as exhibit A-2. The same document had been submitted to substantiate the claim in the first board hearing and was filed on June 10, 1965, in this court as an attachment to Plaintiff's Response to the Commissioner's Pretrial Order.

Exhibit A-2 contains the following subjects:
Statement of General Conditions—2 pages.
Bid Schedule of Work Items and Chart, June–November—3 pages.
Daily Log Summary—June 2, 1958 through December 19, 1958—27 pages.
Summary of Design Changes and Delays by Engineers, Chart—p. 33.
Design Changes, Extra Work, Delays —Itemized—25 pages.

42. 2d Op. p. 3.

stitutes presumptive evidence that the facts stated therein are true and correct,"[43] that standing alone would be sufficient to establish a *prima facie* case in support of plaintiffs' claim.[44]

At the second hearing, exhibit A-2 was examined in minute detail through testimony of witnesses for both parties. The board concluded that Seger's claim of costs as presented in exhibit A-2 was " * * * absolutely useless as a basis for determining the amount of any equitable adjustment * * * " that may be owing to Seger.[45] The board also found that the audit report prepared by plaintiffs after the hearing from the remaining business records was defective and could not be used to determine the amount of any equitable adjustment due from acts that were attributable to the Government.[46]

In view of exhibit A-2's prominence in substantiation for plaintiffs' claim, its contents merit close attention. At the beginning of the project, the estimated value of the 174 work items contained in the prime contract amounted to $886,661.40, and the 89 work items subcontracted to Seger had an estimated subcontract price of $349,249.45.[47] The subcontract bid price was $347,000. According to the information supplied by plaintiffs in response to the Pretrial Or-

der, Seger received extra compensation through the various modifications to the prime contract in the amount of $72,234.64, which brought the total payment on plaintiffs' subcontract for the project to $419,234.64.[48] Seger's total cost in performance of this project, according to exhibit A-2, was $569,694.62, which would amount to a loss to the subcontractor of $150,459.98.[49]

Exhibit A-2 shows that 47 of the 89 items of subcontracted contract work were affected by changes and that 42 items were unchanged. Compensation for 51 days for standby and delay, in a total amount of $97,032.60, was claimed and an additional payment of $11,340.03 was claimed for direct "field costs" of extras from change orders. Exhibit A-2 added a profit of $52,153.87, which represented 10 percent of the gross contract revenue adjusted by the additional claims. Thus, Seger's total claim in exhibit A-2 was for additional compensation of $160,526.50.[50]

Exhibit A-2 presents the subcontractor's claim on a total cost basis. The amount claimed for standby and delay costs was computed from the average per day cost for the 136 actual days worked. Total gross labor cost, equipment depreciation cost, third-party equipment rentals, and general adminis-

---

43. Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment, pp. 20–21.

44. *Id.*, p. 22.

45. 2d Op. p. 15.

46. 2d Op. p. 15.

47. 2d Op. p. 11.

48. Plaintiffs' Statement in Response to Pretrial Order, June 10, 1965, exhibit A, Additional Information, p. 5.

49. Inasmuch as exhibit A-2 was prepared before the first hearing, it shows an adjusted total gross revenue of $413,166.02 and a loss in operations of $156,528.60 because it does not reflect adjustments

of $6,068.62 made subsequently. The audit report submitted by Seger after the second board hearing showed total income from the project of $406,756.11, plus additional income, for a total of $462,243.76 and a net loss on the project of $112,476.84. The board stated that differences between the amounts on exhibit A-2 and the amounts on the audit report could not be reconciled from an inspection of the administrative record. (2d Op. p. 14.)

50. Paragraph VII in the second amended Petition claims $155,526.50 for the value of extra work, time, materials and delays. Plaintiffs' Pretrial Response, *supra* note 48, exhibit A, Recapitulation, p. 42, fixes the net grand total of the claim as $163,850.34.

trative costs were divided by 136 to give a per day average of $1,902.60. Exhibit A–2 sets forth this computation as follows:

Based on 136 Working Days:

| | | | |
|---|---|---|---|
| Total Gross Labor (Excluding G&A) | $115,236.19 | @ 136 Days | $847.32/Day |
| Equipment Depreciation | 25,967.50 | | 190.94 |
| Equipment—3rd Party Rent | 44,601.73 | | 327.95 |
| General Administrative Costs | 72,948.48 | | 536.39 |
| | $258,753.90 | @ 136 Days | $1,902.60 |

Computation of an average daily cost on this basis does not differentiate between costs allocable to the 42 unchanged items of work from the 47 items of work that were affected by change orders.

Total delay costs, in the amount of $97,032.60, were obtained in exhibit A–2 by multiplying the average daily cost by the 51 standby time days summarized on page 33 of the exhibit.

■ This court consistently has refused to allow recovery of claims on the so-called "total cost" method of computation. Recovery on the basis of total expenditures less contract receipts is only appropriate where there are proper safeguards and there is no other alternative to compute reasonable damages when the Government's responsibility for damages is clearly established.[51] Where the "total cost" method of proving damages has been rejected, if the record otherwise contains reasonably satisfactory evidence of damages, or at least is sufficient to afford a basis for a jury verdict, such evidence has been given weight. Where the record is blank with respect to such alternative evidence, however, the court has dismissed the claim for failure of proof.[52]

Ascertainment of increased costs that are directly attributable to delay that results from changes ordered by the Government normally are measurable with a reasonable degree of accuracy. No attempt is made in exhibit A–2 to correlate costs attributable to particular delays that result from identified changes ordered. No attempt is made to correlate alleged labor inefficiency and indirect overhead expenses to the changed items of work as distinguished from the unchanged work items.

The audit report submitted by plaintiffs after the second board hearing is similarly deficient. The purpose of this audit was to show details of lump-sum figures on page 2 of exhibit A–2. The audit, however, gives no detailed breakdown of the figures for labor, contractor-owned equipment depreciation, third-party equipment rentals, and general and administrative costs so as to allow allocation to changed and unchanged items of work.[53]

It is clear that exhibit A–2, the basic support for the subcontractor's claim is, as found by the board, " * * * absolutely useless as a basis for determining the amount of any equitable adjustment * * * " to which Seger may be entitled because of Government acts.[54] The

51. Boyajian v. United States, 423 F.2d 1231, 1235, 191 Ct.Cl. 233, 239 (1970). *See also* River Constr. Corp. v. United States, 159 Ct.Cl. 254, 270 (1962); J. D. Hedin Constr. Co. v. United States, 347 F.2d 235, 246, 259, 171 Ct.Cl. 70, 86, 108 (1965); H. John Homan Co. v. United States, 418 F.2d 522, 528, 189 Ct.Cl. 500, 509 (1969).

52. Boyajian v. United States, *supra* note 51, 423 F.2d at 1244, 191 Ct.Cl. at 254, and cases there cited.

53. In its comment to the board on Seger's audit, counsel for defendant stated "There is no way to take the audit figures and determine the accuracy or validity of the claimed daily amount of $1,902.60 as shown on page 2 of the claim." (Added exhibit No. 7.)

54. 2d Op. p. 15.

basis for the claim, set forth on page 2, and the Summary of Design Changes, tabulated on page 33, do not establish that Seger was delayed 51 days due to acts of the Government, or that the costs of such delays amounted to $97,032.60.

Exhibit A–2 in the Daily Log Summary Section, pp. 8–26, and in the Design Changes Section, pp. 34–57, contains materials that are informative. These sections, however, obviously are incomplete and cryptic and need to be fleshed out with testimony to be meaningful. This was done extensively in the second board hearing.

On the basis of proof of damages as shown in exhibit A–2, as supplemented by the audit report, there would be no need to make a determination on the merits of the subcontractor's contention that 51 days' delay was caused by the Government. Failure to make a satisfactory proof of the amount of damages that resulted from Government acts would require dismissal of the claim.[55] The board, however, has examined Seger's claim for standby and delay item by item and the case can be disposed of on the merits of the claim. Disposition of the case on adequacy of exhibit A–2 as a measure of an equitable adjustment is not necessary.

Plaintiff asserts that exhibit A–2 is the best evidence now available to support the claim because the Corps of Engineers after the first hearing destroyed or concealed the primary evidence delivered by Seger at that hearing. All of Seger's essential business records in support of plaintiffs' claim, allegedly, were turned over to the Board of Contract Appeals. Many of Seger's business records were delivered at the first hearing. All of his records, however, were not so delivered. At the second hearing, three packing boxes of records and a ledger were presented which were identified as business records.[56] In the period between the first and second hearing, business records were shipped from place to place throughout the country and stored in various warehouses.[57]

At the second hearing, copies of many of the records and documents used in the first hearing were located and made available. Plaintiffs' counsel did not seek to adjourn the second hearing or request additional time to study the copies of such records and documents that were located during the second hearing. No demonstration has been made that loss or destruction of particular documents in fact has interfered with preparation or presentation of plaintiffs' claim.

*Extra Work.* One element in plaintiffs' claim was for payment in the amount of $11,340.03 for the "Direct Field Costs of Extras, not paid, as shown in the 'Changes' Schedule."

The board found, and the evidence in the administrative record establishes clearly, that this element of Seger's claim had been the subject of negotiated adjustments on which agreement had been reached and payment provided in formally accepted modifications to the contract. This amount, $11,340.03, had been included in Modifications Nos. 23 and 24 on April 3, 1959, except for $422.50 allowed by the board in its first opinion in connection with "Seger's Pumping Claim."[58] Modification No. 25, July 25, 1961, included the board allowed amount. Thus, at the time of the first hearing in May 1960 when plaintiffs first submitted exhibit A–2, the Government had paid virtually all of the amount claimed for "Direct Field Costs of Extras, not paid." Modifications to the contract for changes had been affirmatively accepted without protest by

55. Boyajian v. United States, *supra* note 51, 423 F.2d at 1235, 191 Ct.Cl. at 239.

56. 2d Op. p. 3.

57. Mr. Seger estimated that around 800 lbs. of his records had been shipped or stored in West Virginia, Pennsylvania, California, and Minnesota.

58. 1st Op. p. 25.

the prime contractor,[59] and Mr. Seger, personally, had negotiated price adjustments and reached agreements with the Government's contracting officer on Modifications Nos. 23 and 24 for the additional compensation for changes that affected his work.

Plaintiff challenges the board's finding that the items for extra work claimed by the subcontract had been negotiated and agreement reached in Modifications 23 through 25. He denies that the contract modifications, duly executed by representatives of the Government and the prime contractor, in fact represented an accord and satisfaction for plaintiff subcontractor's extra work in the claims involved.[60]

■ In his testimony at the second hearing, however, Mr. Seger acknowledged that he had negotiated and had been paid for claims for additional "field costs" in the amount of approximately $11,000. Mr. Seger's testimony is clear that the formally accepted contract modifications included compensation for the subcontractor's "Direct Field Costs of Extras" that resulted from the change orders. The testimony establishes that the modifications did not provide for the additional costs involved in the standby and delay element of the subcontractor's claim.

*Standby and Delay Time.* Plaintiffs' claim for 51 days' standby and delay time involved (1) failure of the Government to provide control staking in a timely fashion, and (2) work stoppages with attendant idle personnel and equipment, caused by repetitive orders to change structures or to await decisions on changes. With respect to the contention that the Government did not provide control staking by its survey parties in a timely fashion, the prime contract required the Government to establish the centerline of the diversion channel, levee, and limits of the stone protection work. The prime contractor was responsible for all layout surveys for all construction staking and was obligated to establish required elevations for slope staking from Government-established control points.[61]

In its first opinion, although the board did not consider the merits of the claim as to delays to Seger, the claim was considered as to delays to the prime contractor. The board noted that the Government admitted it was slow in making control surveys in the early part of the job, and found that there was some evidence of delay to the work of the clearing subcontractor.[62] The board, in the first opinion, examined the changes involved in each of the 24 contract modifications and the prime contractor's claim for delay costs as set forth in Seger's presentation, exhibit A–2. No adjustment was found to be due the prime contractor by virtue of slowness in control staking. In four specific instances, however, from the items listed in exhibit A–2, the board found that the Government had caused

---

59. 1st Op. p. 10; 2d Op. p. 8.

60. Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment, pp. 41–46.

61. The contract, in Clause SC–17 (Specification 2380, Part III, Special Conditions), states:
"SC–17 SURVEYS:
"*a. Layout of Work*:
"(1) The Government will establish the centerline of the levee, diversion channel and limits of stone protection work. The established bench marks are indicated on the drawings.

"(2) From the centerline, limits of work, and bench marks established by the Government, the Contractor shall complete the layout of work and shall be responsible for all measurements that may be required for the execution of the work to the location and limit marks prescribed in the specifications or on the contract drawings, subject to such modifications as the Contracting Officer may require to meet changed conditions or as a result of necessary modifications to the contract work. * * *"

62. 1st Op. p. 9.

delays other than from control staking to the prime contractor. For such delays equitable adjustments were ordered to be made.[63]

At the second hearing, the question of lack of control staking was thoroughly examined. In its second opinion, the board found:

> \* \* \* The record does not contain testimony and evidence sufficient to support a finding that Seger was in fact delayed or his work suspended by acts of the Government by reason of slow or piecemeal establishment of the primary control survey. \* \* \* [64]

The evidence in support of this finding includes testimony of witnesses called by both sides. Plaintiffs' witness, Mr. Cowan, was the General Superintendent of one of the prime contractors, Darrough and Sons, in charge of construction by subcontractors. This witness testified that " \* \* \* very little" of Seger's work was actually held up by the lack of centerline staking. The Government's witness, Mr. Liss, was in charge of a survey crew employed by Darrough and Sons to perform all construction staking required by the contract.[65]

Mr. Liss described the sequence of surveys required to be performed before the subcontractor structure surveys were made. After location of the centerline stakes by the Government, the prime contractor had to have clearing stakes in order to prepare the ground. Once cleared, the ground had to be restaked to locate slope stakes and levee stakes. Only after slope staking and levee staking had been completed, could staking for the structural subcontractor be located.

Mr. Liss testified that the Government had sufficient crews to perform its centerline staking and that the Government had put in its control staking ahead of the prime contractor's work. In six minor instances, the prime contractor's crew put in the centerline, in some cases for the benefit of the prime contractor. Structure staking was done on order of the prime contractor, and Seger, the structure subcontractor, was never denied structure staking because the areas were not prepared.

With respect to delays to the structure subcontractor, Mr. Liss testified that in a "couple of places" the subcontractor was delayed in structural work by reason of failure of the prime contractor to set stakes after the Government control stakes were set. Mr. Liss testified, however, that he had no direct knowledge that Seger, in fact, had been so delayed.[66]

■ The prime contractor, not the Government, was responsible for structural staking. The Government was responsible to the prime contractor for control staking. The claim that any delay to Seger was caused by slow Government control staking, rather than a failure by the prime contractor in construction staking, is not supported on the record. Seger's work had to wait upon clearing of the work sites and excavation and placing of embankment by the prime contractor and other agencies. Delays to Seger have not been identified with tardiness of the Government in control staking.

---

63. 1st Op. pp. 19–23. The board found that the prime contractor and Seger had failed completely to prove that the number of changes ordered had such an effect on the prime contractor's or subcontractor's work as to indicate an abuse of the right to make changes, or that inefficiency resulted from such changes. (p. 21.)

64. 2d Op. p. 12.

65. Construction staking involves clearing stakes, slope staking for the levee, and structure staking for the subcontractor.

Under the contract, all of this staking was required to be performed by the prime contractor.

66. 2d Tr., p. 461. Mr. Liss testified:
"Q Now, do you know of your own knowledge whether the Government delayed Seger at the Compton siphon by staking?
"A That I couldn't say.
"Q How about 93+78?
"A That I couldn't say."

Exhibit A–2, starting at page 33, lists 24 instances where design changes and delays by engineers allegedly resulted in partial suspension of Seger's work. The board stated that it analyzed the claim for standby and delays item by item from the standpoint that any entitlement to an equitable adjustment for suspension costs would include costs incurred because of abortive starts on changes, subsequent starts on repetitive changes, and the loss of efficiency resulting from such repetition.[67]

This part of the claim in exhibit A–2 is presented in terms of Elapsed Time, Standby Time, and Extension of Time, as follows:

ELAPSED TIME: represents the interval, in days, of the time actually involved in the carrying out of a change order; or the time, in which work scheduled to be carried out, was delayed because of anticipated Change Orders, lack of Control Staking by the Engineers or other delays directly attributed to the Corps of Engineers.

STANDBY TIME: is that time lost due to changed conditions, in which crews could not work or lost efficiency in being moved to unscheduled areas of work because of the above Design Changes.

EXTENSION OF TIME: represents the time that should have been allowed, under a normal contract, to complete the additional work, in addition to the time allowed for scheduled items.

The number of days shown as Elapsed Time, Standby Time, and Extension of Time in the Table on page 33 of exhibit A–2, does not accord with the "Actual Working Days" set forth in the Statement of General Conditions on page 1 of exhibit A–2. The board pointed out that the 490 days designated as Elapsed Time was 242 percent of the actual time required for Seger to perform the subcontract work, including all changes.[68] The total of 51 Standby Time days claimed exceeds the 27 additional days in fact required by Seger to complete the original work as changed (136 days) over his initial estimate (109 days). The 93 Extension of Time days is more than three times the 27 days additional actual working days that were required over the original estimate.

The board found that its record did not permit an overall determination that the Government caused either a total or partial suspension of Seger's work.[69] Each of the 24 claims listed in exhibit A–2 were examined item by item; seventeen items identified claims for Standby Time.[70] The board's examination, set forth in detail in its second opinion, is supported by the testimony of the witnesses and the documentary evidence incorporated in the administrative record. Only one instance was found where part of Seger's work force may have been on standby unproductively[71] because of Government-caused delay. This instance involved 2 days' standby time of a pipe layer and a labor foreman on August 25–27, and amounts to an adjustment of $193.23, which increases to $225.60 at the prime contractor level. The board's determination was made on the basis of Seger's Daily Log Summary, exhibit A–2, and the testimony of Government witnesses.[72]

█ The board's item by item analysis of Seger's claim was comprehensive and complete; its finding that the Government was not responsible, with the exception of one minor instance, for delays to Seger is supported by substantial evidence. On the other hand, support for Seger's claim is, for the most part, mere

---

67. 2d Op. p. 15.

68. 2d Op. p. 16.

69. 2d Op. p. 16.

70. No Standby Time was claimed in Items 4, 6, 12, 13, 14, 16, and 18.

71. 2d Op. p. 27.

72. 2d Op. pp. 25 and 27; exhibit A–2, pp. 16 and 52, item 17, Station 106–93.

assertion, without creditable basis in the administrative record. Plaintiffs do not reference testimony or evidence that would uphold a decision contrary to the decision of the board. There is no basis in the record that would support a determination that the board acted arbitrarily or capriciously in its consideration of the testimony and the documentary materials related to the claims for delays to the subcontractor.

Plaintiffs contend that the board's decision is predicated upon evidence that legally is not adequate to rebut the claim. Plaintiffs contend that:

> * * * All of the material evidence offered in defense was either hearsay, opinion based on hearsay, presumptions and innuendo for which no factual basis existed and absurdities and meaningless statements the core of which have been richly quoted in this brief.[73]

█ Essentially plaintiffs attack the testimony presented to the board by the Government's witnesses, Mr. Edward Liss, Mr. Glen McCain, and Mr. Kirk Dunann. Plaintiffs seek to establish that testimony of these witnesses in certain respects was hearsay. Each witness had direct responsibilities relevant to administration of the contract and performance by the subcontractor. Each had personal knowledge of the problems experienced under the contract and testified on the basis of documentary records and such personal knowledge. It would be difficult to locate witnesses that would be more familiar with the contract and operations thereunder. Credibility of witnesses and the probative value of their testimony are matters for the determination of the board as trier of the facts. The board's determination is not to be overruled unless it is found that testimony by the witnesses is discredited by undisputed evidence or by fact.[74]

It is clear that the board in reaching its decision based its findings on many factors in the administrative record other than testimony presented by the witnesses who are challenged by plaintiffs. For example, the board's findings with respect to item 9 of the claim, relocation of Parshall Flume, was based on Seger's daily log summary and relevant drawings.[75]

█ *Indemnification.* In its second cause of action, the second amended petition seeks indemnification for plaintiff Ukropina in the event that plaintiff Seger is successful in its California State Court action for the same relief and founded on the same extra work, time, materials, and delays as are included in Seger's claim to the board. The Government's obligation to prime contractor, Ukropina, is defined in Contract No. DA–04–167–CIVENG–58–65. No facts have been presented which would establish, expressly or by implication, assumption of any obligation by the Government to indemnify the prime contractor. At the present time, Mr. Seger has not established that the prime contractor has any liability to the subcontractor for breach of contract. Whether such liability may be established in the future in the State Court action is uncertain and the amount, if any, is indefinite.

In any event, the State Court will not have before it and will not determine any Government liability to the prime contractor, and the State Court's decision will not establish the validity of any claim of the prime contractor against the Government. If Seger should prevail in the State Court, at that time the question of liability to Ukropina, if any, on the part of the

---

73. Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment, p. 59.

74. Dittmore-Freimuth Corp. v. United States, 390 F.2d 664, 685, 182 Ct.Cl. 507, 540 (1968); *see also* Ambrose-Augusterfer Corp. v. United States, 394 F.2d 536, 543, 184 Ct.Cl. 18, 30 (1968); Koppers Co. v. United States, 405 F.2d 554, 557–558, 186 Ct.Cl. 142, 148–149 (1968).

75. 2d Op. p. 22;. *see also* Item No. 17, Station 106–93, 2d Op. p. 25.

Government may be determined. Ukropina, at this time, does not have a claim to submit to the Government and decision would amount to no more than a declaration of Ukropina's rights in connection with a potential liability in an undetermined case in a State Court.

## CONCLUSION

For all of the foregoing reasons and upon the law and the evidence in the administrative record, Plaintiffs' Motion for Summary Judgment is denied, Defendant's Cross-Motion for Summary Judgment is granted as to Plaintiffs' First and Third Causes of Action, and Defendant's Motion to Dismiss Plaintiffs' Second Cause of Action is granted. Accordingly, Plaintiffs' Second Amended Petition is dismissed.