LOCKHEED MARTIN CORPORATION and Lockheed Martin Advanced Environmental Systems, Incorporated, Plaintiffs,

v.

THE UNITED STATES of America, Defendant.

No. 98–468C.

United States Court of Federal Claims.

Oct. 16, 2001.

Thomas P. Madden, with whom were Mitchell Y. Mirviss, Charles R. Marvin, Jr., Fernand A. Lavallee, Paul A. Debolt, Lawrence B. Bernard, Venable, Baetjer, Howard & Civiletti, Washington, D.C., for plaintiffs. Durwood E. Timmons, Sherman & Howard, Colorado Springs, CO, of counsel.

Donald E. Kinner, Assistant Director, with whom were Matthew P. Reed, David R. Feniger, and Mark Powell, Commercial Litigation Branch, and David M. Cohen, Director, and Stuart E. Schiffer, Deputy Assistant Attorney General, Department of Justice, Washington, D.C., for defendant. Donald Crockett and Ralph R. Throckmorton, Office of General Counsel, U.S. Department of Energy, Washington, D.C., of counsel.

## OPINION

BASKIR, Chief Judge.

This is a suit by Lockheed Martin Advanced Environment Systems (LMAES), a subcontractor, and its parent company Lockheed Martin Corporation (LMC), seeking damages from the Government under the Contract Disputes Act of 1978(CDA) for a default termination by Lockheed Martin Idaho Technologies Company (LMITCO), a Government contractor and also a wholly owned subsidiary of LMC. The Government asserts a lack of privity between the United States and the Plaintiffs, and seeks dismissal for want of subject matter jurisdiction. Despite extensive documentary discovery and dogged advocacy, the Court is unpersuaded by the Plaintiffs' theories of privity. At its core, this is little more than a garden-variety lawsuit by a subcontractor lacking privity with the Government, and therefore must be dismissed.

### I. *Introduction*

In 1989, the Idaho National Engineering and Environmental Laboratory (INEEL), a Government-owned research and engineering support site located on 890 square miles of southeastern Idaho desert, was declared a Superfund site pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601 *et seq.* In 1991, the Department of Energy (DOE), the Environmental Protection Agency (EPA) and the State of Idaho Department of Health and Welfare executed a binding Federal Facilities Agreement and Consent Order which established a procedural framework for remediation efforts.

As a result, DOE launched a massive initiative to clean up the radioactive waste left over from almost 50 years of use as a military weapons firing range, a nuclear reactor testing station, a nuclear fuel reprocessing station, and as a crude dump for other types of defense-related solid and liquid contaminated waste, much of it buried in shallow trenches and pits. In 1986, DOE identified about 500 suspected hazardous waste release sites; as of June 1994, approximately 230 of those required further action. One of these sites is the Pit number 9 site, whose subcontract for remediation (Pit 9 Subcontract) is at issue in this case.

Prior to this, in 1976, DOE entered into a management and operating contract (M & O Contract) with a contractor known as EG & G Idaho, Inc. That prime contract, which was modified and renewed several times between 1976 and 1994, was to provide research, development and other support and facilities management services at the INEEL. By late 1993, in accordance with the 1991 Facilities Agreement and Consent Order, DOE, EPA and Idaho issued the Record of Decision (ROD) which determined the substantive and technical terms for the Pit 9 Subcontract. Pursuant to that ROD, in August 1994, EG & G signed a letter subcontract with LMAES, a subsidiary of LMC. In Octo-

ber 1994, LMITCO, also a subsidiary of LMC, replaced EG & G as the M & O contractor and entered into a perfected firm-fixed-price subcontract, the Pit 9, with LMAES.

This case derives from the cure notice issued by LMITCO in February 1998, and LMITCO's subsequent termination of LMAES' subcontract for default in April 1998. Plaintiffs brought suit in this Court in June 1998 pursuant to the CDA, the Tucker Act, and the Fifth Amendment of the United States Constitution. Also in 1998, LMITCO brought suit against the Plaintiffs in the U.S. District Court for the District of Idaho, and the Plaintiffs counterclaimed, raising the same claims as in this case. *Lockheed Martin Idaho Tech. Co. v. Lockheed Martin Advanced Envtl. Sys.*, No. 98–316E (D. Idaho, filed August 11, 1998).

In the following pages, we will first discuss the somewhat unusual procedural context in which the jurisdictional question is presented.

## II. *Jurisdictional Challenge—Procedural Context*

Plaintiffs filed this action against the Government on June 1, 1998. The Defendant responded with a motion to dismiss the Plaintiffs' contract and takings claims under RCFC 12(b)(1). The Government further argued that even if the Court found it possessed jurisdiction over the takings claim, it should still dismiss it pursuant to RCFC 12(b)(4) for failure to state a claim. Finally, Defendant asserted as an affirmative defense that Plaintiffs are contractually bound to resolve their dispute regarding the default termination before the Federal or State Courts of Idaho.

Plaintiffs rejoined, among other things, that the motion launched a factual attack on their complaint, and that the Court should dismiss the motion and allow the Plaintiffs to obtain full discovery on matters relevant to the jurisdictional allegations. Plaintiffs also argued that dismissal under 12(b)(1) was not appropriate because the material jurisdictional facts were inextricably intertwined with facts pertaining to the merits of their claim.

Due to the fact-intensive nature of the Plaintiffs' jurisdictional theory, on October 1, 1999, the Court stayed the Government's motion and directed the Government to file its answer. The Court permitted the Plaintiffs to support their factual assertions by relying on the extensive discovery then underway in the parallel Idaho litigation. Pursuant to an agreed-upon schedule which permitted the Plaintiffs to review the Idaho case documents, the Government again moved to challenge jurisdiction—this time in a Rule 56 motion for summary judgment.

The Government's summary judgment motion does not address the merits of the Plaintiffs' claims, save for the takings claim, but focuses upon whether this Court has jurisdiction to hear Plaintiffs' case. Regardless of how the motion is styled, the Court concludes it must treat the Government's motion for summary judgment as a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. A brief comparison of RCFC 12(b)(1) and 56 is appropriate at this point.

Upon reflection, a Rule 56 motion will be seen as an inappropriate mechanism for challenging subject matter jurisdiction. The differences between the two rules are plain. First, a Court must resolve a jurisdictional issue regardless of how that issue is presented, whether by the parties or *sua sponte.* By contrast, a Rule 56 motion is precipitated by a party. Under Rule 56, only undisputed facts may be considered by the Court and factual inferences are held against the movant. If facts are disputed, the motion fails and the fact-finder—usually, a jury—resolves the issue. In a motion to dismiss, the Court finds the facts and makes inferences. Finally, the summary judgment movant has the burden of persuasion, whereas the Plaintiff must establish jurisdiction irrespective of how that issue was precipitated. In the end, summary judgment motions are designed to test the legal merits of an action, and an adverse ruling is a decision on the merits.

The establishment of jurisdiction is the basic prerequisite to reaching the merits of a claim. See Judge Posner's typically incisive analysis in *Crawford v. United States,* 796 F.2d 924, 928 (7th Cir.1986), where he suc-

cinctly stated that "jurisdictional issue[s] must be resolved first." This distinction is reflected in our Rules, as in the Federal Rules. RCFC 12 provides that (b)(4) motions for failure to state a claim (Rule 12(b)(6) in the Federal Rules) translate into Rule 56 motions if matters outside the pleadings are raised. But no such conversion occurs for a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. Simply put, it is not logical to seek summary judgment before ruling on the jurisdictional issue. *See Winslow v. Walters*, 815 F.2d 1114, 1116 (7th Cir.1987).

In a case procedurally similar to this one, a defendant's motion for summary judgment was granted on the grounds that the district court lacked subject matter jurisdiction. *Indium Corp. of America v. Semi–Alloys, Inc.*, 781 F.2d 879 (Fed.Cir.1985). The Federal Circuit instructed that it is appropriate for a trial court judge to treat a defendant's summary judgment motion as a " 'suggestion' of lack of subject matter jurisdiction" and conduct an inquiry into the jurisdictional question. *Id.* at 883–84. The Federal Circuit noted that while "the matter should have been raised by a renewed motion to dismiss under Rule 12(b)(1)", there was "no error in the district court's handling of the case". *Id.* at 884.

Courts, therefore, treat any motion that challenges the court's authority or competence to hear the action as if it properly raises the jurisdictional point. *Crawford*, 796 F.2d at 928; *Indium*, 781 F.2d at 883–884. Regardless of how the Government designates its jurisdictional challenge, the Court is required "to inquire *sua sponte* whenever a doubt arises as to the existence of federal jurisdiction." *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 278, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). The Court is not limited to the jurisdictional allegations found in the complaint, but may properly consider evidence submitted by the parties to determine whether subject matter jurisdiction exists. *Crawford*, 796 F.2d at 929; *Grafon Corp. v. Hausermann*, 602 F.2d 781, 783 (7th Cir.1979).

The Government's motion addresses the jurisdictional issue of whether Plaintiffs, as subcontractors, sufficiently established that they were in privity with the Government such that they could bring suit pursuant to section 10(a) of the CDA and the Tucker Act. *See E. Trans–Waste of Maryland, Inc. v. United States*, 27 Fed.Cl. 146, 150 (1992). At first, the Government vigorously disputed the Plaintiffs' voluminous series of proposed facts, inferences, and conclusory assertions submitted by the Plaintiffs as part of the Rule 56 process. Then, during oral argument the Government accepted all of Plaintiffs' facts as true for the purpose of analyzing the jurisdictional question. The Government's argument has thus devolved from challenging the Plaintiffs' jurisdictional facts, to a simple argument that even if all of the facts underlying the Plaintiffs' jurisdictional theory are true, they have not sufficiently established privity. Accordingly, the Court treats the Government's motion for summary judgment on jurisdiction as if it were a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction.

During oral argument, the Plaintiffs suggested that they would be prejudiced if the Court considered the jurisdictional issue as a motion to dismiss. They said that they would need the additional discovery set out in counsel's Rule 56(g) affidavit. This might be true if the Plaintiffs' legal theory of privity were properly founded on contested factual assertions. But the Court concludes that the Plaintiffs' fact-driven theory of privity is not supported by authority, and that their factual case is, in a word, irrelevant. It is to those legal theories that we now turn.

### III. *Jurisdiction*

The U.S. Court of Federal Claims is a court of "special and, therefore, limited jurisdiction." *Blazavich v. United States*, 29 Fed. Cl. 371, 373 (1993). Because the court was established pursuant to Article I of the United States Constitution, 28 U.S.C. § 171(a), its powers are limited to that granted by Congress and by its own rules, which were adopted under Congressional authority. *In re United States*, 877 F.2d 1568, 1571 (Fed. Cir.1989). It is well established that this Court possesses jurisdiction over a matter only to the extent that the United States has

waived its sovereign immunity, and that waivers should be strictly construed in favor of the Government. *United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). The burden of establishing jurisdiction falls upon the party asserting jurisdiction. *Rohmann v. United States*, 25 Cl. Ct. 274, 277 (1992).

Plaintiffs assert this Court possesses jurisdiction over their default termination claims pursuant to section 10(a) of the CDA, 41 U.S.C. § 609(a), and the Tucker Act, 28 U.S.C. § 1491(a)(1) and (2). The Tucker Act provides in relevant part that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded ... upon any express or implied contract with the United States ...." 28 U.S.C. § 1491(a)(1) (2001). The Tucker Act does not create any substantive right of recovery for money damages, but confers jurisdiction upon the Court whenever a separate substantive right exists. *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980). Plaintiffs argue that the separate substantive right lies in section 10(a)(1) of the CDA:

> Except as provided in paragraph (2), and in lieu of appealing the decision of the contracting officer under section 605 of this title to an agency board, a contractor may bring an action directly on the claim in the United States Court of Federal Claims, notwithstanding any contract provision, regulation, or rule of law to the contrary.

41 U.S.C. § 609(a)(1) (2001).

### A. *Contractual Privity*

■ The Tucker Act allows the Court to render judgment upon any claim by or against, or dispute with, a *contractor* arising under section 10(a)(1) of the CDA, including a dispute concerning termination of contract. 28 U.S.C. § 1491(a)(2). Subcontractors, however, generally do not have the right to seek and collect contract damages from the Government pursuant to the CDA because they usually are not in contractual privity with the Government. *See United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1550 (Fed.Cir.

1983); *see also United States v. Blair*, 321 U.S. 730, 737, 64 S.Ct. 820, 88 L.Ed. 1039 (1944).

The Government routinely uses a two-tier contracting system for its procurements. It enters into a contract with a prime contractor; the prime contractor in turn enters into a contract with a subcontractor. This system creates a legal buffer between the subcontractor and the Government. It provides the Government with a means of "administering its procurement through a single point of contact, [thereby making] the Government's job... simpler and cheaper." S.Rep. No. 1118 at 16–17 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5235, 5250. "If direct access were allowed to all Government subcontractors, contracting officers might, without appropriate safeguards, be presented with numerous frivolous claims...." *Id.*

■ Therefore, in most cases, the subcontractor has no right of direct action against the Government, but must go through the prime contractor. *See, e.g., Nat'l Leased Hous. Assoc. v. United States*, 32 Fed.Cl. 454, 460 (1994). There are two ways in which a subcontractor can recover *indirectly* from the Government. First, any subcontractor claims that are sponsored or certified by a prime contractor and are brought in the prime contractor's name are allowed. *United States v. Turner Constr. Co.*, 827 F.2d 1554, 1559–61 (Fed.Cir.1987). Second, a prime contractor can include its liability to a subcontractor in its damages against the Government. *Pan Arctic Corp. v. United States*, 8 Cl.Ct. 546, 548 (1985).

■ There are a few exceptions to the general no-privity rule for subcontractors which allow a subcontractor to bring *direct* action against the Government. The subcontractor, however, must have entered into an explicit or implicit contract with the Government. *See Blair*, 321 U.S. at 737, 64 S.Ct. 820; *Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1160–61 (Fed.Cir.1985); *Putnam Mills Corp. v. United States*, 202 Ct.Cl. 1, 479 F.2d 1334, 1337 (1973) ("It is clear that, unless the plaintiff can provide evidence of the existence of some type of contract between it and the United States, it cannot, as a subcontractor, recover directly from the

United States for amounts owed to it by the prime.") (citation omitted). Thus, Plaintiffs' claim cannot be "jurisdictionally sound" unless a contract, or its jurisdictional equivalent "specifically allows the monetary relief" Plaintiffs request. *Son Broad., Inc. v. United States,* 42 Fed.Cl. 532, 535 (1998).

### B. *Johnson Controls*

The seminal case addressing the issue of whether a subcontractor may directly sue the Government under the CDA is *United States v. Johnson Controls, Inc.,* 713 F.2d at 1541. Johnson Controls, a subcontractor, had appealed to the Armed Services Board of Contract Appeals (ASBCA) after the contracting officer refused to issue a final decision on the merits of a claim that the prime contractor, Turner, had certified for Johnson. The ASBCA found that Johnson could bring direct action against the Government because privity existed between the two. The ASBCA relied upon a number of contractual provisions: (1) The Government inspected the work and had the sole authority to reject it, and it was the interpreter of the drawings and specifications; (2) the Government made the decisions concerning equitable adjustments for changes and suspensions of work under subcontracts; and (3) the Government decided disputes under the terms of both the prime contract and subcontract, with the contracting officer defined as the person executing "this contract," *i.e.,* both the prime contract and subcontract, on behalf of the Government. *Id.* at 1548.

The Federal Circuit reversed the ASBCA's decision, holding that *Johnson Controls* did not "present the factors necessary to fall within any recognized exception to the well-entrenched rule that a subcontractor cannot bring a direct appeal against the government." *Id.* at 1550. *Johnson Controls* clarified two ways in which a subcontractor would be in privity with the Government and thus bring a direct appeal. The first is in when the contractual provisions indicate that the parties intended to give the subcontractor the right to direct appeal against the Government. The second is when the contract provides that the contractor will act as a purchasing agent for the Government. The

Federal Circuit also mentioned a third possible theory—that privity is created when the Government so circumvents the authority of the contractor that the contractor becomes a mere agent for the Government.

We will consider each of the subcontractor privity theories and their application to the Plaintiffs. While the Plaintiffs seek shelter under each of these exceptions, it is the day-to-day "direct control" theory upon which they primarily rely.

### C. *The Day–to–Day Control Theory*

■ Plaintiffs' main argument is that privity was created by DOE's direct control, through day-to-day activity and through contractual provisions, over the Pit 9 Subcontract and LMAES' actions under that subcontract. These are two very distinct theories, the former being fact driven and presenting far-reaching implications for the doctrine of subcontractor privity. It was in support of this theory that the Plaintiffs sought access to the Idaho case discovery. Through this information, they have reconstructed the actual day-to-day relationship between the three parties, the Government, the contractor LMITCO, and the subcontractor LMAES. In particular, they point to three signal episodes, the negotiation of the Pit 9 contract, the mechanisms adopted to address the organizational conflict of interest, and the termination for default. Although we have drastically reduced the Plaintiffs' detailed and lengthy factual recitation, we believe the following summary adequately describes the nature of their factual case, albeit not the full flavor of it.

### i. *The Negotiation of the Pit 9 Subcontract*

As we previously mentioned, in August 1994, DOE awarded the INEEL M & O contract to LMITCO, replacing EG & G as the M & O contractor. LMITCO's contract, however, did not take effect until October 1994. EG & G had signed a preliminary subcontract with LMAES while the former was still M & O contractor. But when it lost the contractor competition to LMITCO, it no longer had any interest in continuing negotiations, nor would it have been appropriate to

do so. However, LMITCO was a sister company of LMAES, both being wholly owned subsidiaries of LMC, and it was also not appropriate to have LMITCO do the negotiations while the organizational conflict of interest remained unresolved. Consequently, DOE barred EG & G/LMITCO from any further role in the still-pending subcontract negotiations with LMAES:

EG & G has been directed to transfer all negotiation responsibilities associated with the Pit 9 effort over to DOE–ID to eliminate any potential conflicts of interest. Based on this direction, the following changes in contract administration are to take place immediately: (1) All negotiations associated with the Pit 9 activity whether associated with the RFPP, the 30% design contract or in anticipation of the Phase 2 and 3 contract will be accomplished under the control of DOE–ID with the support of EG & G; (2) EG & G shall maintain daily administrative control of current activities including technical management, submittal of deliverables, billings, small business reporting, etc; (3) All Contractual direction will be taken from [DOE Contracting Officer David Letendre]; (4) Correspondence shall be directed to [Letendre] with a copy to the EG & G Subcontract Administrator.

DOE Memo., D. Letendre to B. Edwards, Aug. 15, 1994.

DOE Contracting Officer Letendre placed all negotiation efforts under the control of DOE and ordered that all contractual direction be taken from him. Mr. Letendre bargained directly with LMAES over subcontract terms such as price, schedule, and contract length. DOE ordered EG & G representatives not to talk to LMAES Pit 9 personnel concerning the contract without first obtaining Mr. Letendre's approval. After Mr. Letendre had participated in the subcontract negotiations with LMAES, he approved the award of a letter subcontract. Mr. Letendre then directed EG & G to execute the subcontract.

ii. *The Organizational Conflict of Interest*

After LMITCO was awarded the INEEL M & O contract, LMITCO and DOE began four months of negotiations to develop a "Plan for Mitigating Organizational Conflicts of Interest in the Pit 9 Comprehensive Demonstration Project" (OCI Plan). Until an agreement for the plan was completed and approved, LMITCO could not exercise any contracting responsibilities regarding the Pit 9 subcontract. The OCI Plan, once established, was incorporated into LMITCO's M & O contract, and LMITCO regained its contracting power.

The first step of the OCI Plan was to create a Sequestered Team of LMITCO employees who were required to act in DOE's best interest and to report to a Program Oversight Board (POB). The second step was the establishment of the POB. The POB was to consist of one program official of DOE–ID, an interested independent party selected by mutual agreement, and a LMITCO nominee subject to approval by the DOE Contracting Officer. The Team could only recommend that actions be taken if it had received the POB's approval. The purpose of the Team and the POB was to assure "that DOE can directly determine, in all instances, the course of action that best serves its interests without requiring the establishment of a separate prime contract for Pit 9." (Draft) Plan for Mitigating Conflicts of Interest in the Pit 9 Comprehensive Demonstration, early November 1994, at 2.

The POB initially consisted of two members, Lisa Green, a DOE official representative, and Clair Fitch, a team member. David Letendre, the DOE Contracting Officer, served as an acting member of the POB to fill the position of the independent member. A permanent member for the independent third position was not found until December 1995. Thereafter, Mr. Letendre served as a non-voting advisor to the POB. The permanent independent third member was H. Larry Spilker. Before his appointment to the POB, Mr. Spilker had served as EG & G General Counsel. Mr. Spilker was paid for his POB service, despite a POB provision that prohibited the independent representative from having an employment or financial interest in LMITCO, LMAES or DOE. Additionally, Mr. Spilker had at several times

provided legal advice to DOE–ID's general counsel regarding Pit 9 issues, had obtained a 10–day contract for legal services with DOE–Chicago, and gave advice to the Subcontract Administrator concerning Pit 9 issues.

The Sequestered Team reported directly to the LMITCO nominee on the POB. The OCI Plan required the POB to oversee the following areas: (1) acceptance of LMAES deliverables, including oversight to assure that treated soils and other treated materials met the Pit 9 Subcontract specifications and requirements; (2) decisions regarding all change order requests; (3) directives that in any manner bore upon the LMAES guarantee of performance, and (4) ensuring that LMITCO did not perform activities under its DOE M & O contract that were the contractual responsibility of LMAES under its fixed price subcontract. The OCI Plan further required all change order requests over $100,000 accepted by the POB to be approved by the DOE Contracting Officer. The POB was kept generally apprised of all day-to-day events of the Pit 9 Subcontract. The POB on several occasions rejected Team recommendations.

### iii. *The Termination for Default*

The POB required LMITCO to obtain its approval before terminating the Pit 9 Subcontract. Despite a number of requests, the POB prevented the Team from issuing a cure letter to LMAES for over a year, and once the letter was issued, the POB worked closely with the Team in reviewing LMAES' cure notice response and analyzing the termination decision. Then, in 1998, DOE stopped using the POB despite the Team's OCI and the terms of the OCI Plan. In June 1998, the Team recommended that the Subcontract be terminated for default. Contracting Officer Letendre issued his final decision rejecting LMAES' response and approving the termination of the Subcontract for default.

### iv. *Privity Through Actual Day–to–Day Control*

Plaintiffs' argument that privity is established through the Government's day-to-day direct control over the subcontract and over LMAES' actions rests on their readings of *Johnson Controls,* 713 F.2d at 1541; *RMI Titanium Co. v. Westinghouse Elec. Corp.,* 78 F.3d 1125 (6th Cir.1996); *Seger v. United States,* 199 Ct.Cl. 766, 469 F.2d 292 (1972); *McMillin Bros. Constructors,* EBCA No. 328–10–84, 86–3 BCA ¶ 19,179, 1986 WL 20168 (1986), *aff'd sub nom. McMillin Brother Constructors v. Watkins,* 949 F.2d 403 (Fed.Cir.1991); *Arntz Contracting Co.,* EBCA No. 187–12–81, 84–3 BCA ¶ 17,604, 1984 WL 13945 (1984), *aff'd sub nom. Arntz Contracting Co. v. United States,* 769 F.2d 770 (Fed.Cir.1985); and *General Coatings Inc.,* EBCA No. 218–8–82, 1983 WL 13333 (1983), *aff'd,* 84–1 BCA ¶ 17,111, 1983 WL 13493 (1983). They also cite most of these cases for their alternative theory of control via contract. We will examine the cases first for their relevance to the day-to-day theory, and then once again for the control-by-contract theory.

*Johnson Controls* did not involve a privity claim based on control via day-to-day direct dealing between the Government and the subcontractor. The Federal Circuit focused on contract provisions not day-to-day Government involvement in the performance of the subcontract. The Federal Circuit very clearly stated in its opinion:

> It is also significant to note that it has not been asserted ... that direct dealings between the government and Johnson created privity of contract.... Rather, the basis for the board's holding that there was privity between the government and Johnson was that the *contract provisions* in the prime contract and the subcontract so circumvented the independent authority of the prime contractor that [the prime contractor] was acting as an agent of the government.

*Johnson Controls,* 713 F.2d at 1553 (citations omitted) (emphasis added). *Johnson Controls,* therefore, is inapplicable to Plaintiffs' day-to-day privity theory.

Plaintiffs next rely upon the Sixth Circuit's decision in *RMI Titanium,* which we will discuss further below. The Court found privity here. 78 F.3d at 1126, 1141. It looked to the same factors the Federal Circuit looked to in *Johnson Controls* to deter-

mine the parties' contractual intent as well as other contractual relationships between the Government and the Plaintiff. *Id.* at 1139–40. At no point did the court examine the Government's day-to-day control over the contractor or subcontractor as an element of privity.

Plaintiffs cite to several Department of Energy Board of Contract Appeals (EBCA) cases, but none of them addresses the effect of the Government's control over day-to-day subcontractor activity. The Board in *McMillin Bros. Constructors* began its discussion by reviewing the Energy Board decision on jurisdiction, as well as *Johnson Controls.* It concluded it "need not decide" "whether the actual relationship is one of principal-agent." 86–3 BCA at 96,992. Instead it focused upon the "contractual nexus between the Government and the subcontractor," and actually found that there existed "a direct *contractual* relationship." *Id.* at 96,990; 96,992 (emphasis added).

*Arntz Contracting Company* involved a subcontractor who entered into a subcontract that also contained a flow-down disputes clause, giving it the contractual right to direct appeal. Again, the EBCA did not look to actual day-to-day control, but focused on contractual provisions:

> The critical element is the degree of control, a factor which may be determined from the extent, scope, and degree of the detailed requirements included as *contractual conditions.*

*Id.* at 87,701 (emphasis added). At one point, the opinion refers to "the acts of the parties," but this ambiguous phrase is otherwise unexplained. *Id.* at 87,702. It follows a discussion of the contractual relationship and cannot be stretched to imply that the parties' day-to-day activity formed a basis for the finding of privity.

*General Coatings, Inc.* involved a subcontractor who appealed the final decision of an M & O contractor, pursuant to a disputes clause contained in the subcontract. Again, the contract governed. The disputes clause specified that the subcontract was subject to the CDA and that the subcontractor had the right to appeal directly the contractor's decision to the EBCA. 1983 WL 13333. The

EBCA found that a "direct contractual relationship exist[ed] between the Government and [the subcontractor]," and looked to contractual provisions. *Id.* The Board found "no need in this instance to discuss the issue of agency [control] since we find a direct contractual relationship exists between the Government and [the subcontractor]." *Id.*

The only case to address the issue of day-to-day direct dealings between a subcontractor and the Government was *Seger v. United States,* a suit brought by a subcontractor and contractor appealing the decision of the Corps of Engineers Board of Contract Appeals. The plaintiffs argued, among other things, that

> direct dealings between employees of both the prime contractor and the subcontractor and Government representatives created a relationship in which the original prime contract was superseded or supplemented by express oral contracts and implied contracts with each plaintiff.

469 F.2d at 300.

The Board found that all formal contract action (changes, payments, contract administrative acts) occurred between the Government and the contractor, and that any informal dealings between the Government and the subcontractor were for the convenience of the parties and not sufficient to create new or independent contracts. *Id.* at 301. The Court of Claims affirmed the Commissioner's recommendation, which discussed the number of changes made, somewhere around 450 in all. The Court held that the number of changes ordered did not constitute an unreasonable exercise of the contracting officer's discretion, and did not result in a new, implied contract between the Government and the subcontractor. *Id. Seger,* therefore, does not offer support for Plaintiffs' argument, either.

The Plaintiffs' argument that a subcontractor can enter into privity with the Government via the Government's control over the day-to-day activities of the subcontractor has no support in the cases they have cited. Moreover, the implications of Plaintiffs' actual control theory for future subcontractor claims are profound. If the Court were to

accept Plaintiffs' theory as valid, then any subcontractor who had a dispute concerning its subcontract would have the right to obtain discovery exploring the entire course of contract activity between the parties.

The discovery in this case provides a dramatic illustration. The Plaintiffs here, relying on discovery conducted in the Idaho case, had access to approximately 5 million pages of documents. They produced a factual presentation totaling over 500 pages, including 334 assertions in their Consolidated Statement of Uncontroverted Facts. Further, they filed over 200 pages of substantive legal briefing in opposition to the Government's dispositive motions. They submitted a four-volume appendix in support of their opposition to the motion to dismiss and an eight-volume appendix in support of their opposition to the motion for summary judgment.

And they were not finished yet. Counsel executed an affidavit under Rule 56(g) seeking additional discovery. All this was aimed at establishing jurisdiction. The actual merits of their claim—the termination—would presumably involve far less discovery. Under their theory, privity by conduct would inevitably become an issue in any Government-subcontractor lawsuit, and this kind of discovery would become routine. Such a profound alteration in the litigation of subcontractor claims shows that Plaintiffs' theory simply goes too far. To underline this point, at oral argument, counsel were unable to suggest any limiting factor—save Rule 11—that would preclude equally extensive discovery as routine in future subcontractor suits alleging this theory of privity under the CDA.

### D. *Direct Control Via Contract*

█ The Plaintiffs' second theory of privity concerns control established through contractual provisions. In *Johnson Controls,* the Federal Circuit did discuss as a possible exception to the general no-privity rule, the theory that contract provisions could so circumvent the independent authority of the prime contractor that the prime contractor becomes an agent of the Government. 713 F.2d at 1552. It is important to note that the Court did not hold that privity existed when

contract provisions circumvent the contractor's authority. The Court simply stated as its own dicta that the dicta of *Continental Illinois v. United States,* 112 Ct.Cl. 563, 81 F.Supp. 596 (1949), "certainly implied that privity between the government and a subcontractor could be found if the contract provisions circumvent the authority of the prime contractor." *Johnson Controls,* 713 F.2d at 1551–52.

The Federal Circuit went on to discredit the "direct control" theory by emphasizing that the Court of Claims did not actually find privity in *Continental,* and the Federal Circuit knew of no case where privity had been found based upon the circumvention of authority theory. *Id.* Finally, the Court stated that while the Government had retained a great deal of control over the contractor's actions in its dealings with Johnson and other subcontractors, it was apparent that the Government meant to use the contractor as a buffer between it and the subcontractor's claims. *Id.*

Plaintiffs argue that several cases following *Johnson Control's* rejection of the *Continental Illinois* dicta established that privity exists between a subcontractor and the Government when the Government exercises direct control over the subcontractor through contract provisions. In support, they cite *BellSouth Telecomm., Inc. v. United States,* 991 F.Supp. 920, 927 (E.D.Tenn.1996) and *L.O. Warner, Inc.,* EBCA Nos. 351–2–86 and 359–6–86, 86–3 BCA ¶ 19,207, 1986 WL 20169 (1986), as well as the same cases as earlier, *RMI Titanium, Seger, McMillin Bros., Arntz,* and *General Coatings.*

In *RMI Titanium,* as we mentioned previously, a federal subcontractor brought action against a prime contractor and the Government in district court. The usual privity positions were reversed. The defendants moved to dismiss, arguing that the CDA preempted the district courts of jurisdiction over the contract claims between the subcontractor and the contractor, and between the subcontractor and the Government, in the latter case because privity existed. 78 F.3d at 1127. The plaintiff disclaimed any contractual relationship with the Government, arguing

its dispute was merely with the contractor. *Id.* at 1137.

On appeal, the Sixth Circuit held that the subcontractor had to bring its suit under the CDA, despite its status as a subcontractor. The court applied the same four elements the Federal Circuit relied upon in *Johnson Controls* to determine the intent of the parties, finding most did not apply: (1) RMI had previously been under a direct contract with the Government for almost thirty years and prior to suit being filed the subcontract was assigned to the Government; (2) the RMI subcontract contained an express disputes clause that authorized and directed RMI to bring its claims to the DOE contracting officer and gave RMI the right to direct appeal; (3) the prime contractor was not required to obtain a Miller Act bond; and (4) there was no ABC disclaimer of privity with DOE. *Id.* at 1140–41.

However, the Court's privity analysis must be read with caution. The Sixth Circuit takes the evident view that the CDA was intended to bring subcontractor claims within its scope. *Id.* at 1137–38. It read *Johnson Controls* as *requiring* the presence of the four factors in order to find an *absence* of privity. Lacking those factors and finding other elements mentioned in the BCA cases, *McMillin Bros.* and *Arntz*, along with some aspects peculiar to its case, the Court found privity. In any event, putting aside the Sixth Circuit's particular reading of the CDA, Government control over the subcontractor was not a factor in the Court's decision.

*BellSouth* was almost identical to *RMI Titanium*. *BellSouth* involved a subcontractor who commenced an action against the Government in district court under the Federal Torts Claim Act. The court held that because the plaintiff's claims were essentially contractual in nature, they had to be resolved under the CDA and the Tucker Act. 991 F.Supp. at 927. The court further held that the plaintiff's status as a subcontractor did not remove the plaintiff's claims from the CDA. *Id.* at 925–26.

The Court looked to its Circuit Court decision in *RMI Titanium* decision as authoritative guidance. *Id.* at 926. The Court found that Bell South was a contractor for the purposes of the CDA based upon the long contractual history between it and the Government. The court also focused on various contractual provisions which clearly established the parties' intent to have the contractor serve as the Government's agent and to give the subcontractor a right of direct appeal against the Government under a disputes clause and the CDA. *Id.* at 927–28. Like *RMI Titanium*, this was a contract interpretation analysis that did not rely on the degree of control, except to the extent that the agency relationship was a matter of explicit contract intent.

Some of the cited Energy Board cases do discuss contractual control as a key element in an agency relationship, but we do not read them as holding this feature itself creates privity. For example, *McMillin Bros.* relied upon the absence of an ABC clause, the presence of an authorized flow-down disputes clause, the requirement of a Miller Act bond, and various other contract provisions that the Board felt tied the subcontractor to the Government, *i.e.,* direct passage of title required Government approval and the Government's right to directly pay the subcontractor. 86–3 BCA at 86,993. As we observed earlier, it saw no need to address agency/control. *Id.* at 86,992.

In *Arntz* the Board looked to the contractual relationship of the parties, applying the *Johnson Controls* analysis. 84–3 BCA at 87,702. It cited the fact that title to all items purchased by the contractor passed directly to DOE from the subcontractor; a special bank account under a letter of credit was established as a revolving fund for payment of costs incurred under the contract; and DOE retained ownership to any unexpended advanced funds and tangible personal property. *Id.* at 87,701–02. The pivotal factors in finding privity were the presence of a subcontractor-furnished Miller Act bond payable to the Government and a Government-approved flow-down disputes clause. *Id.*

At two points in the opinion, the Board discusses the concept of "control," but it expressly noted that the facts in this case were previously considered sufficient to establish privity, "notwithstanding the absence

of an agency relationship." *Id.* Citing prior cases which involved "the unique relationships of some of its prime contractors operating Government-owned national laboratories under various" contractor relationships, it concluded that "[t]he degree of control exercised by the Government was the critical factor which determined the actual legal relationship" in those instances. *Id.* at 87,701.

And again, commenting generally about Federal subcontractors' right to appeal directly to agency Boards, it stated: "[t]he critical element is the degree of control, a factor which may be determine [sic] from the extent, scope, and degree of the detailed requirements included as contractual conditions." *Id.* This observation immediately precedes the discussion of the contractual relationships and the identification of the *Johnson Controls* factors we itemized above. It is noteworthy that the Board did not discuss the *Johnson Controls* factors in terms of control. Rather, it applied the *Johnson Controls* nomenclature: Privity as a function of the parties' contractual intent. Despite its discursive review of the Board's prior treatment of agency/control, which is simply dicta, we do not regard *Arntz* as more than an Energy Board application of *Johnson Controls.*

In *L.O. Warner,* the EBCA reiterated the factors considered in *Johnson's* intent-of-the-parties analysis. 86–3 BCA at 97,142. The Government conceded the contracts were "factually similar" to those in *Arntz* and *McMillin. Id.* at 97,141. It asked that the Board reconsider those decisions. The Board declined, and concluded the facts were "indistinguishable" from those in *McMillin Bros. Id.* at 97,142. Looking to the *Johnson Controls* factors, it found three of them "support[ing] the opposite conclusion." *Id.* There was no ABC clause, the subcontract contained a flow-down disputes clause, and the subcontractor was required to furnish a Miller Act bond. Based upon these factors, the Board found privity. *Id.* at 97,143.

Finally, in *General Coatings,* the EBCA found a direct contractual relationship between the Government and the subcontractor based upon the same factors discussed in *Arntz.* 1983 WL 13333. But again, the pivotal factors were the Government-approved disputes clause giving the subcontractor direct access to the Board, the absence of any language in the subcontract that contradicted the disputes clause, and the subcontractor-furnished Miller Act bonds. *Id.*

We are unconvinced of Plaintiffs' argument for a number of reasons. First, we do not read these cases as relying upon an analysis of the Government's direct contractual control over the subcontractor in order to find privity. In each of them, the Courts and Boards looked to contractual history and provisions to determine the parties' intent to create privity. While some cases may have made mention of Government control over the subcontractor, Plaintiffs cannot deny the other controlling factors present in each case.

It is also important to recognize that all of the cases cited by the Plaintiffs involved the presence of a flow-down disputes clause that contractually guaranteed the subcontractor the right to direct appeal against the Government. That factor, in and of itself, makes for a strong case that the parties intended the subcontractor to have the contractual right to bring direct action against the Government. But beyond this, these cases incorporated factors, discussed in *Johnson Controls* and in this opinion, which serve as an indication of the parties' intent to give the subcontractor the right to a direct appeal against the Government.

Moreover, we observe that aside from the Sixth Circuit cases, the three cases mentioning direct control are each Energy Board cases, *McMillin Bros., Arntz,* and *General Coatings.* Board cases are not, of course, binding in this Court. While two of the Board cases were affirmed by the Federal Circuit, the affirmance was without comment. *Arntz Contracting Co. v. United States,* 769 F.2d 770 (Fed.Cir.1985); *McMillin Bros. Constructors, Inc. v. Watkins,* 949 F.2d 403 (Fed.Cir.1991). The Federal Circuit has yet to give any explicit approval or endorsement of this theory after its rejection of it in *Johnson Controls.* Finally, we note that the Energy Department and its Contract Board have traditionally been more amenable to subcontractor privity. *See Johnson Controls,* 713 F.2d at 1556. Even granting the

Plaintiffs the most sympathetic reading of the EBCA cases, we are disinclined to adopt their view.

As the discussions in *Johnson Controls, Arntz* and other Energy Board cases reveal, the predecessor constituent agencies of the DOE—the Energy Research and Development Administration (ERDA) and the Atomic Energy Commission (AEC) particularly—had special relationships with their subcontractors and contractors. Through the use of Management and Operations prime contracts—the same kind of instrument in our case—flow-down disputes clauses and other devices, the agencies were particularly sympathetic to Government-subcontractor ties. This policy was reflected in Energy Board decisions which, although not marked with doctrinal consistency, also tended to permit subcontractor appeals to the Government by one theory or another.

This affinity for subcontractor privity continued post-creation of DOE, post-CDA, and post-*Johnson Controls*. If *Arntz* talks about "control" and "agency," then finds contract factors which sound very much like "agency," yet explicitly disclaims that concept and professes to apply a *Johnson Controls* analysis, perhaps one can explain this logical dexterity as the product of tension between a lenient decades-long Department policy and a more unforgiving Circuit authority.

In sum, the Court is not persuaded by either version of Plaintiffs' direct control theories. The CDA provides a waiver of sovereign immunity for contractors, who are in privity with the Government. Finding subcontractors in contractual privity on either theory would represent a dramatic extension of this waiver. "It is a fundamental legal tenant that the United States as sovereign is immune from suit except where it consents to be sued and that any such waiver of sovereign immunity must be narrowly construed." *Nat'l Leased Hous.*, 32 Fed.Cl. at 454 (citation omitted).

### E. *The Purchasing Agent Test*

As it reviewed the pre-CDA exceptions to the "well-entrenched rule" that subcontractors cannot bring direct appeals against the Government, the Federal Circuit in *Johnson Controls* considered the "purchasing agent" exception—cases very different from *Johnson Controls*—finding authority in only two—*Kern–Limerick, Inc. v. Scurlock,* 347 U.S. 110, 112, 74 S.Ct. 403, 98 L.Ed. 546 (1954) and *Western Union Tel. Co. v. United States,* 66 Ct.Cl. 38, 50, 1928 WL 3062 (1928). 713 F.2d at 1550. Moreover, it mentioned one post-CDA Energy Board case, *A & B Foundry, Inc.,* EBCA No. 118–4–80, 81–1 BCA ¶ 15,161 (1981), in which the parties stipulated to the presence of a "purchasing agent" relationship, and which concluded that the supplier was therefore a "contractor" for purposes of the Act. *Id.* at 75,005.

■ The Federal Circuit discussed the three-part test established by the Supreme Court to establish privity of contract when the prime contractor is a mere Government purchasing agent. *Johnson Controls,* 713 F.2d at 1551. The test rests on interpretation of the contract and requires that (1) the prime contractor was acting as a purchasing agent for the Government; (2) the agency relationship between the Government and the prime contractor was established by clear contractual consent; and (3) the contract stated that the Government would be directly liable to the vendors for the purchase price. *Johnson Controls,* 713 F.2d at 1551 (citing *Kern–Limerick,* 347 U.S. at 112 n. 2, 74 S.Ct. 403 and *Western Union,* 66 Ct.Cl. at 50). The Circuit Court placed the most stringent emphasis on the third element, stating:

> Even if we assume, for discussion purposes only, that an agency relationship can be implied under the provisions of the prime contract, there is still no contract provision providing that the government is directly liable to a subcontractor for the goods or services supplied to Turner.

*Id.*

■ The purchasing agent exception has no necessary application to Plaintiffs' circumstances. The test originally derived from cases questioning the validity of states' gross receipts tax as applied to purchases made by the Government from vendors for use on Government projects. *United States v. New Mexico,* 455 U.S. 720, 742, 102 S.Ct. 1373, 71 L.Ed.2d 580 (1982); *Kern–Limerick,* 347

U.S. at 112, 74 S.Ct. 403. This Court, much like the Federal Circuit in *Johnson Controls*, recognizes the situational differences between the Supreme Court tax cases and the present case. In any event, the Plaintiffs here do not satisfy the test any more than did Johnson.

In *Kern–Limerick*, the prime contract contained provisions which made the purchasing agent relationship explicit:

The Contractor shall act as the purchasing agent of the Government in effecting such procurement and the Government shall be directly liable to the vendors for the purchase price.... Title to all such materials, articles supplies and equipment, the cost of which is reimbursable to the Contractor hereunder, shall pass directly from the vendor to the Government without vesting in the Contractor, and... shall vest in the Government at the time payment is made... by the Government or the Contractor.

347 U.S. at 112–13, 74 S.Ct. 403.

Additionally, both the request for bids and the purchase order contained provisions which stated that the purchase was made by the Government, that the Government shall be obligated to the vendor for the purchase price, that the vendor agrees to make demand or claim for payment of the purchase price from the Government through the contractor, and that title to all materials shall vest in the Government directly from the vendor. The "purchasing agent" relationship could not have been more explicit.

In *United States v. New Mexico*, a state tax case, the Supreme Court found that contractors who made purchases for use in Government projects were not acting as purchasing agents for the Government. 455 U.S. at 743–44, 102 S.Ct. 1373. The Court looked to the following factors: the contractors made purchases in their own names; contractors were not required to obtain Government approval of their purchases; vendors were not informed that the Government was the only party with an independent interest in the purchase; and the Government disclaimed any formal intention to denominate the contractors as purchasing agents. *Id.* at 742, 102 S.Ct. 1373. The Court came to its conclusion despite the Government's own representation that it was directly liable to vendors and despite the fact that title passed directly from the vendor to the United States.

Plaintiffs have cited the presence of some elements found in *Kern–Limerick*, such as the required Government approval of LMITCO's expenditures and the direct passage of title on purchases made by LMITCO under the contract from LMITCO to DOE. Even conceding that these aspects meet some of *Kern–Limerick's* elements, what is critically missing, however, is any explicit contractual provision or formal intention to make LMITCO DOE's purchasing agent, or to make DOE directly liable to LMAES for the purchase price.

Plaintiffs argue that the preamble to the subcontract—to which the Government, of course, is not a signatory—constitutes a contractual agreement that LMITCO was DOE's purchasing agent. The relevant portion of the preamble provided that LMITCO's primary responsibility was to "[a]dminister the subcontract for the DOE by serving as *contracting agent.*" This one isolated phrase, found only in the preamble and which did not appear in the prime contract, is not the equivalent of the clause found in *Kern–Limerick*. It is not the equivalent of the direct passage of title to the Government and the Government's acknowledgment that its contractors were its purchasing agents, factors present in *New Mexico*, where no privity was found. If the Supreme Court was unconvinced by that statement, we are not swayed by a phrase that does not actually refer to LMITCO as a purchasing agent.

Plaintiffs repeated reliance upon the extrinsic evidence of a LMITCO employee's interchangeable use of the terms "contracting" and "procurement agent" is irrelevant. Moreover, a private employee does not possess the authority or power to make himself a procurement agent of the Government, nor may his off-hand comments take the place of explicit contractual terms.

Plaintiffs have shown no evidence that DOE was directly liable to LMAES for the "purchase price," or more accurately stated

for this case, for the necessary expenditures. Plaintiffs refer to the fact that the LMITCO M & O contract was a cost-plus-fee contract that entitled LMITCO to reimbursement for all allowable costs, an award fee, plus an incentive fee. This payment scheme, however, was also present in *New Mexico* and the Court did not find that it made the Government liable to the vendor. 455 U.S. at 725–26, 102 S.Ct. 1373.

Finally, Plaintiffs cite the following contract provision to support the implication that the Government agreed to be responsible to the vendor:

> Whenever the terms of this contract require the approval of the Contracting Officer or designee with respect to any expenditure or commitment by the contractor, the Government shall not be responsible unless and until such approval or action is obtained by the contractor.

LMITCO M & O Contract, Section C.18, p. C–10.

The implication, however forced, is not enough. This provision of the M & O Contract simply states that DOE would never be liable unless it had approved the expenditure. It does not state that DOE would *always* be liable if it had approved the expenditure. The case law requires that the contract clearly state, not vaguely imply, that the Government is liable to the vendor. *Johnson*, 713 F.2d at 1551. Plaintiffs have failed to establish that privity was created by LMITCO serving as DOE's purchasing agent.

### F. *Subcontractor Direct Appeal Against the Government*

■ Now we finally address the four factors which *Johnson* cited as evidence that the parties did not intend the contract to authorize a direct appeal by the subcontractor. However, a preliminary caution is necessary. These four factors are not offered as *the test* for a finding of no-privity. Rather, in *Johnson Controls* the contract was susceptible of divergent interpretations because of a number of elements, chiefly: 1) the flow-down disputes clause; 2) the incorporation by reference of the prime contract into the subcontract, and of some specific provisions, as well; and 3) references to Johnson as both "contractor" and "subcontractor."

Notwithstanding this, the four elements that led the Court to interpret the contract as not intending privity were: (1) the Government and the subcontractor never entered into a direct contractual relationship; (2) the "ABC" clause, contained both in the prime contract and the subcontract, specifically disclaimed a contractual relationship between the Government and the subcontractor; (3) the prime contractor was required to obtain a Miller Act payment bond, which provided a recourse by the subcontractor other than a direct appeal; and (4) there was no provision in any of the contract documents that clearly authorized a direct appeal by a subcontractor. *Johnson Controls,* 713 F.2d at 1552–53.

In our case it is clear that LMAES and DOE never entered into a direct contractual relationship. DOE, notwithstanding its role in the drafting of the Pit 9 Subcontract, did not sign the subcontract. The subcontract does not list DOE as a party to the contract, but states that it is between LMAES and LMITCO. Pit 9 Fixed Price Subcontract No. C91–133136 at 1. DOE is not mentioned in the subcontract, save for two sections—one refers to a DOE contracting officer in the context of patent rights issues, *id.* at 9, 10, and the other identifies a DOE contracting officer as the official to whom LMITCO could submit a sponsored claim on behalf of LMAES, EG & G Idaho, Inc. Standard Terms and Conditions for Purchase Orders and Subcontracts, Revised for Pit 9 (June 1994), Section 35(d). Finally, LMAES and DOE had no prior direct contractual relationship.

With respect to the second element, the presence of an ABC clause, the Federal Circuit agreed with the Claims Court's remark in *Continental* that "[a] mere statement that a contractual relationship did not exist would be ineffective if all the elements of such a relation were otherwise present." 713 F.2d at 1553 (quoting *Continental,* 81 F.Supp. at 598). Still, this observation does not detract from the conclusion that the ABC clause was "an important, if not determinative, factor in [the Federal Circuit's] analysis of the intent

of the parties as seen through the contract documents." 713 F.2d at 1553. While the present case lacks the literal ABC clause found in *Johnson Controls*, DOE's M & O contract with LMITCO contains two provisions which make the parties' intent clear. The first provision states:

Except as may be expressly set forth therein, any consent by the contracting officer to the placement of subcontracts shall not be construed to constitute approval of the subcontractor or any subcontract terms or conditions, determination of the allowability of any cost, revision of this contract, or any of the respective obligations of the parties thereunder, or *creation of any subcontractor privity of contract with the Government.*

LMITCO M & O Contract No. DE–AC07–94ID13223, Section H.3 Subcontracts (APR 1993), subsection (a)(3) (emphasis added).

The second M & O contract provision states:

Subcontracts shall be in the name of the contractor, and shall not bind or purport to bind the Government.

*Id.* at Section I–85.

These contractual provisions could not be more explicit and definitive. They demonstrate that the parties never intended to create privity of contract between DOE and LMAES. There is no contradictory provision in the subcontract.

Moreover, the subcontract contains at least two provisions which make clear the no-recourse intent of the parties:

The Contract Disputes Act of 1978 ... shall not apply to this subcontract; provided that nothing in this clause shall prohibit Contractor, in its sole discretion, from sponsoring a claim of the subcontractor for resolution under the provisions of its prime contract with DOE.

EG & G Idaho, Inc. Standard Terms and Conditions, Section 35(d).

And—

[A]ny such litigation shall be brought and prosecuted exclusively in Federal District Court; with venue in the United States District Court for the District of Idaho in Pocatello, Idaho.... In the event that the requirements for jurisdiction in any Federal District Court are not present, such litigation shall be brought in the District Court of... the State of Idaho.

*Id.* at Section 35(a)(1–2). The Plaintiffs are, of course, taking advantage of the Idaho venue provision as counterclaimants in LMITCO's suit in the District of Idaho.

The third and fourth *Johnson* indicators are analytically reverse images of each other—a Miller Act bond shows the parties' intent to give the subcontractor recourse against the contractor; the absence of a provision for direct appeal against the Government reinforces that intent. The Federal Circuit stated,

Whatever else may be gleaned from the existence of the Miller Act bond, one thing is clear: Johnson was provided with a means of recourse other than a direct action against the government.

713 F.2d at 1554. The Federal Circuit reasoned that the Government would not have required the prime contractor to supply a payment bond with the expense involved if the parties intended that the subcontractor was a contractor with a right of direct appeal against the Government. In our case, we have no Miller Act bond, a requirement in construction contracts (40 U.S.C. § 270a (2001)) and there is no affirmative provision authorizing recourse against the Government.

\*     \*     \*     \*     \*     \*

■ We close this discussion with some final observations about *Johnson Controls*. What made that case difficult, more difficult than ours, was the presence in the contract of provisions which put the parties' intent into question. On the one hand, the ABC clause showed the parties' intent to preclude privity. On the other, there was the inclusion of a standard disputes clause, a clause which prior to the enactment of the CDA provided the contractual basis upon which a contractor could bring a claim against the Government to a Board of Contract Appeals. 713 F.2d at 1554. That clause, or clauses similar to it, were instrumental in the EBCA cases we have discussed that found privity. Thus, the Federal Circuit in *Johnson Con-*

*trols* took the unusual posture of citing contractual elements that *disproved* privity. This should not distract us from the central *Johnson Controls* analysis. Because waivers of sovereign immunity must be strictly construed, there must be a clear contractual intent to establish privity between the Government and the subcontractor. In the end, the Federal Circuit gave decisive weight to the ABC clause, concluding that the disputes clause had not been included to provide a claims procedure for subcontractors, but was mere boilerplate language leftover from pre-statutory days. *Id.* at 1555.

Our case presents no such dilemma. There are no provisions that provide contractual consent for direct subcontractor appeals—no flow-down disputes clause that implies a subcontractor right of appeal. Rather, we have several clauses that explicitly state that the subcontractor does not have the right to direct appeal against the Government.

The *Johnson Controls* opinion concludes with an observation which we consider especially apposite. It was not

> likely or reasonable that the parties contemplated direct subcontractor appeals in the absence of an *explicit statement authorizing such a procedure* .... This is particularly true in light of the fact that direct subcontractor appeals have only been permitted in rare, exceptional cases; it is therefore unlikely that the parties would agree to such an unusual procedure by using such ambiguous language.

713 F.2d at 1556 (citation omitted) (emphasis added).

▉ In sum, the existence of subcontractor-Government privity is determined by contractual provisions that make that intent manifest. The contracts in our case contain no such "explicit statement."

### IV. *Fifth Amendment Takings Claim*

Plaintiffs also allege that the Government has unconstitutionally taken their contract rights without fair compensation. They rely upon *Castle v. United States,* as supporting the proposition that "a litigant may indeed maintain a takings [claim] even where its

rights have been created exclusively by contract." 48 Fed.Cl. 187, 217 (2000). *Castle,* the Plaintiffs argue, held that Fifth Amendment protections apply when the Government takes "away the range of remedies associated with the vindication of a contract." *Id.* at 219. Plaintiffs allege that if they are not allowed recourse against DOE, then they lack adequate remedy for their contractual injuries and have suffered an unconstitutional taking of their contract rights.

*Castle,* however, said less than that. It suggested a taking might be present if the Government deprived a party of *all* avenues to vindicate a contract right. *Id.* at 219. Here we have concluded that the Plaintiffs had no contract right vis-a-vis the Government. Being denied this forum cannot be a taking even under *Castle.* The contractual right with which they are vested is against LMITCO and they maintain the right to litigate their claim in the U.S. District Court for the District of Idaho.

### V. *Conclusion*

Because Plaintiffs failed to establish that this Court has subject matter jurisdiction over their contract claims, the Court hereby DISMISSES counts I—XII and XIV of the Second Amended Complaint. The Court GRANTS Defendant's motion for summary judgment on Plaintiffs' Takings claim and count XIII is hereby DISMISSED.

The Clerk of the Court is directed to enter judgment dismissing the case. Each party to bear its own costs.

IT IS SO ORDERED.